# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

_____

FAIL-SAFE LLC,

       Plaintiff,

     v.                                       Case No. 08-CV-310

A.O. SMITH CORPORATION,

       Defendant.

_____

## ORDER

Litigation is often the story of regret, and the underlying facts in this case present the quintessential example of such a tale. Undoubtedly, the defendant, A.O. Smith Corporation ("AOS"), wishes it had never contacted the plaintiff, Fail-Safe LLC ("FS"), in 2002 regarding the safety device that FS had developed for use in swimming pools. Similarly, the plaintiff likely laments the fact that it never entered into a written agreement with AOS either formalizing the two companies' relationship or, at the very least, protecting the confidentiality of the information FS was imparting to AOS in discussions with AOS representatives. Moreover, if FS could turn back the hands of time, it surely would have filed its complaint in this case sooner than April 11, 2008. (Docket #1). In short, the instant case, as it stands today, is a product of a series of questionable business decisions by both sides, causing each respective party a considerable amount of angst and regret. Against this backdrop, the court must resolve the defendant's January 5, 2010 motion for partial summary judgment (Docket #121), the motion identified by all of the parties as the issue on the

clerk's docket that the court should first decide. (Docket #186). This order will also

discuss several other pending motions and the future course of this litigation. The

court's hope is that, through this order, the parties' tale of regret will soon reach its

final chapter. The court begins by noting the undisputed facts animating the

defendant's motion for summary judgment.

## UNDISPUTED FACTS[1]

This case centers on the two parties' efforts to develop appropriate technology

to effectively combat "pool suction entrapment" accidents. Pool suction entrapment

occurs when a swimmer is trapped by the suction forces created by water rushing

out of a drain in an artificial pool, such as a swimming pool, hot tub, or spa.[2] Pool

suction entrapment can be quite serious. During the period 1999 to 2009, the

Consumer Product Safety Commission reported ninety-four incidents of "circulation

entrapments, including 12 fatalities . . . and 79 injuries." *See* Kevin Gipson, *1999-*

*2009 Reported Circulation/Suction Entrapments Associated with Pools, Spas, and*

---

[1] The court spent a significant amount of time separating the "wheat from the chafe" with regard to the parties' proposed findings of fact. Proposed findings of fact are not intended as an additional area for legal briefing. However, the parties' proposed findings of facts are replete with unabashed legal posturing. For example, one of FS's proposed findings of fact states that FS's "information, formulas, artwork, and/or methods necessary to develop new products and enhance existing products are trade secrets." (PPFF ¶ 137). This is not a "fact" and is not far removed from having a proposed finding of "fact" that states the "court should find for the plaintiff." Nor is the defendant innocent of having legal posturing in its findings of fact. *See* DPFF ¶ 41 ("This letter . . . did not create a joint venture with obligations of confidentiality."). Such findings of fact are utterly unhelpful to the court in trying to determine what facts are truly disputed for the purposes of summary judgment, and the parties are reminded to stay loyal to the spirit of Civil L.R. 56(b)(1)(C).

[2] In both above-ground and in-ground swimming pools, drains are used to circulate water throughout the pool to avoid water becoming stagnant.

*Whirlpool Tubs, 2010 Memorandum*, UNITED STATES CONSUMER PRODUCT SAFETY COMMISSION, (May 24, 2010) http://www.cpsc.gov/library/foia/foia10/os/entrap10.pdf (last visited August 27, 2010). Threatened by costly litigation, the swimming pool industry, including the two parties, has endeavored to eliminate accidents caused by pool suction entrapment by developing a safety vacuum release system[3] ("SVRS"), the general term used to refer to a drain entrapment release device. The court begins by discussing FS's initial efforts to develop a successful SVRS.

## A.      FS, the FBSI, and the Suction Safe Pump

Founded in 1997 by Joe Cohen ("Cohen"), FS is a Colorado limited liability company that manufactures anti-entrapment devices. FS's initial attempt at creating a SVRS was its Flow Blockage Suction Interrupt ("FBSI") valve, a "mechanical valve" that operated by letting "air into [a pool's] piping," releasing the vacuum that was creating the suctioning of water and, in turn, releasing the bather. (PPFF ¶ 122). The FBSI valve was triggered "when the vacuum in a pool's circulation system reache[d] a designated level." (PPFF ¶ 122). However, the valve, by removing water from the pool's piping, caused the well-pump motor in the pool to overheat, as "the heat of the motor running without water would damage or destroy the attached pump." (PPFF ¶ 122). The flaw with the FBSI valve prompted FS to "approach"

---

[3] For purely referential purposes, federal law defines a "safety vacuum release system" as a "vacuum system capable of providing vacuum release at a suction outlet caused by a high vacuum occurrence due to a suction outlet flow blockage." 15 U.S.C. § 8002. The court notes that the federal law in question, the Virginia Graeme Baker Pool and Spa Safety Act, is not applicable in this case.

outside companies to seek a solution to the problem with the valve, including the Franklin Electric Company ("Franklin"). (DPFF ¶ 26).

Around 1987, Franklin had developed a technology called the "Pumptec," later known as the "Loadtec" (McAfee Dep. 16), that was used initially in jetted-bathtubs and in submersible wells.[4] Franklin's invention was an "underload sensing device" that would determine "when a pump . . . [was] not running full," such as when the water level in a jetted bathtub "didn't cover the jets," and would "shut down" the motor. (McAfee Dep. 13-14). "Franklin was awarded patents[5] related to detecting the unloading of pump motors by measuring a decrease in the motor's power

---

[4] "Richard Schwartz, marketing manager at Franklin, testified in his deposition that the Loadtec motor was sold for use with swimming pool pumps only in the early 1990s." (Pl.'s Resp. DPFF ¶ 17). However, the issue of when Franklin sold the Loadtec motor for use in swimming pools is irrelevant for the present motion.

[5] Franklin's U.S. Patent No. 4,703, 387, issued in 1987, best describes Franklin's invention and the reason Franklin created the invention in question:

> This invention relates to a control circuit for an electric motor, which automatically turns off the motor during a motor underload condition. Electric motors are frequently utilized to drive a water (or other liquid) pump. In some installations of this nature, damage to the pump may occur if the supply of water to the pump is disrupted for any reason. For example, a motor-pump for circulating water in a home spa or a jetted bathtub may have its water intake clogged, or the motor-pump may be turned on while there is no water in the tub or spa, with the result that the motor-pump runs with a serious undercoat. The pump frequently has a rotary seal which is lubricated by the water being pumped, but in the instance where the pump is running without water, the seals will run while dry. The result is that the seals become hot, and they may become permanently damaged . . . A phase responsive circuit is connected to the amplitude adjustment circuit and to the phase adjustment circuit for producing an adjusted power factor signal, and disconnect means is connected to the phase responsive circuit for disconnecting the power lines when the power factor is below a preset value.

U.S. Patent 4,703, 387.

factor.[6]" (DPFF ¶ 18).  The Loadtec product that was sold by Franklin in the "early 1990s" had a feature that allowed for a two-minute delay on start-up, (McAfee Dep. 25), and would shut off in response to "situation where the flow was blocked if the power factor dropped below" a certain trip point.[7]  *Id.* at 229.

FS hoped that it could use Franklin's technology in conjunction with the FBSI valve to shut down a pool's well-pump motor at the appropriate time.  As a consequence, "FS and Franklin entered into a written agreement in July 1999," (DPFF ¶ 27), where FS "acquire[d] the exclusive marketing rights of the Loadtec Technology with respect to swimming pool circulation pumps in order to sell a Franklin pump motor along with the [FS] valve as a complete safety package." *See* Docket #122 Ex. 16 ("Agreement Between Franklin Electric Co., Inc. and Fail-Safe, LLC for the License of the Franklin Loadtec Technology").  Several adjustments had to be made to Franklin's technology to have it operate properly with FS's valve.  For example, a "soft-start feature" was added, which "slowed acceleration when the motor started up" in order to "reduce pressure spikes in the circulation system." (PPFF ¶ 126).  The nature of the other adjustments that were made to Franklin's technology and who was responsible for such adjustments are disputed by the

---

[6] The parties failed to define what a "power factor" is, but the common definition of the term is that it is the "ratio of the actual power of an alternating or pulsating current, as measured by a wattmeter, to the apparent power, as indicated by an ammeter and voltmeter." RUDOLF F. GRAF, MODERN DICTIONARY OF ELECTRONICS 582 (7th ed. 1999).

[7] FS disputes DPFF ¶ 81, which cites testimony that confirms the features of the original Loadtec motor from the early 1990s.  FS disputes the defendant's finding by arguing that those features were later modified.  This is not a dispute with the finding, but is rather FS's attempt to supplement the finding with additional information.  As such, the defendant's finding is undisputed.

parties.[8] It is undisputed, however, that the motor, as modified, contained a "startup logic delay, a means to detect loss of water flow, the use of a soft-start as applied to a swimming pool pump motor, and a means to enable pool pump motors to accommodate the varying electrical power level available to the pump."[9] (PPFF ¶ 135). The motor and valve collectively were known as the "Suction-Safe Pump."

The Suction-Safe Pump was "offered for sale [to the public] beginning in 1999 and [was] demonstrated at trade shows." (DPFF ¶ 29). The product was not terribly successful though, as the estimated sales for the device through 2003 were "approximately 300 to 350 units." (DPFF ¶ 30). The Suction-Safe Pump "suffered from nuisance trips" (Pl.'s Resp. DPFF ¶31) and, in August of 2001, FS, in conjunction with Franklin, conducted tests on the altered load-sensor, finding the "trip points for hazards and the normal operating parameters to avoid shutting down [the motor] in the wrong circumstances."[10] (PPFF ¶ 131). Franklin independently tested the load-sensor "about two and a half months" after FS tested the product.

---

[8] FS states in its proposed findings of facts that Franklin's load-sensor was programmed to add a feature causing a "two-minute delay after starting." (PPFF ¶ 127). FS further notes that the "motor shutdown parameters" of the load-sensor were "programmed to shutdown in three conditions of low water: loss of prime (air in the system); flow block (suction entrapment); and dead head (discharge blockage)." (PPFF ¶ 128). The defendant disputes whether the noted features were required (Def.'s Resp. PPFF ¶ 127) and whether FS, as opposed to Franklin, was responsible for the required changes. (Def.'s Resp. PPFF ¶ 127-28).

[9] The parties do dispute whether FS developed these features on its own or whether Franklin helped incorporate these features on the pump motor. (Def.'s Resp. PPFF ¶ 135).

[10] The parties dispute the extent to which Franklin facilitated the tests and helped determine the relevant data collected from the tests. (Def.'s Resp. PPFF ¶ 130-31). The parties also dispute the extent to whether the testing FS did was either "sophisticated" or "unique," as the defendant contends that whatever testing FS did was well known within the industry. (Def.'s Resp. PPFF ¶ 136).

(McAfee Dep. 222).  However, despite FS's and Franklin's efforts, FS eventually stopped selling the Suction Safe Pump, and the exact reasons production stopped on the Suction Safe Pump are disputed.[11]

## B.    AOS's Initial Efforts at Creating a SVRS

The court briefly pauses its discussion of the undisputed facts regarding FS and its efforts to built an anti-entrapment device and shifts to the other party in this case, AOS.  The defendant, a Delaware corporation with its principal place of business in Milwaukee, Wisconsin, manufactures motors for pool and spa pumps.

_____

[11] The defendant states that "FS encountered difficulty with this product when it suffered from frequent 'nuisance trips.'" (DPFF ¶ 31).  The plaintiff acknowledges that the pump "initially suffered from nuisance trips," but contends that sales of the product ceased because "the Loadtec was overheating and failing."  (Pl.'s Resp. DPFF ¶ 31).   As will be discussed later in this order, both facts are fairly irrelevant for purposes of the summary judgment motion. The court notes, in passing, however, that the support for the defendant's thirty-first finding of fact is part of Mr. Cohen's deposition, including page 328.   No party supplied the court with this page of the deposition testimony, and, as such, the court notes that the defendant's finding is not supported by page 328 of Mr. Cohen's testimony.  The parties are directed to comments the court made with respect to another summary judgment order issued earlier this year:

> More broadly, this occurrence highlights the utter inefficiency of the protocol followed by most attorneys when filing for summary judgment.  Perhaps filing numerous excerpts from a single person's deposition testimony made sense when courts relied on paper documents.  However, the existence of electronic filing renders such practice archaic.  If the parties are going to be citing to various portions of a witness' deposition, then instead of requiring the court to engage in an archeological dig to find whichever excerpt it needs at any given time, and instead of risking not providing the court with the relevant excerpt, *the parties should have simply filed the entire deposition in one place and then both cite to that one filing whenever referring to the witness' deposition.*  The simple fact is that while the current CM/ECF system holds the promise of greater efficiency for the court, much of that promise is mooted by attorneys' antiquated practices.  Going forward in future cases before this court the parties' attorneys should be much more mindful of how to use the system so as to reduce clutter, promote clarity, and ensure efficiency.

*Lemmermann v. Blue Cross Blue Shield*, No. 08-CV-0779, 2010 U.S. Dist. LEXIS 50477, at *32-33 n.12 (E.D. Wis. May 18, 2010) (emphasis added).

AOS's efforts in developing an anti-entrapment device began in late 2000. In November of 2000, William Mehlhorn ("Mehlhorn"), an engineer for AOS, and other representatives from the company attended an industry trade show in Orlando, Florida. Mehlhorn and the other AOS employees visited several booths at the trade show, including FS's booth, witnessing demonstrations of devices "aimed at detecting suction entrapment events."[12] (DPFF ¶ 8-9). Upon witnessing the demonstrations from the other companies, Mr. Mehlhorn "wonder[ed] if [AOS] could" develop a similar SVRS device using electronic load sensors. (Mehlhorn Dep. 60). Mehlhorn's thoughts developed into a "skunk works project" – a side project that, as Mehlhorn described in his deposition testimony, he would work on "about a day a month." (Mehlhorn Dep. 60). The following year, 2001, Mehlhorn began crafting "schematics" and the physical "circuit boards" for a "pool pump suction detector," that would "measure a motor's power factor and shut-off at a certain amount of decrease

---

[12] FS states that it "disputes" the defendant's ninth proposed finding of fact. However, the dispute is not with the proposed finding of fact, as FS concedes that Mr. Mehlhorn testified that he "observed SVRS valves at the FS and Vac-Alert booths." (DPFF ¶ 9). The plaintiff's apparent "dispute" with the defendant's proposed finding of fact is that the finding of fact is not detailed enough. This is not a dispute, and the plaintiff is wasting the court's time forcing the court to engage in a veritable archaeological dig through the record to determine whether there is an actual dispute with the statement posed by the defendant. The plaintiff would be well advised to only dispute those facts that are actually in dispute and to save its "version of the facts" for its own proposed findings.

in that power factor reading."[13]   (DPFF ¶ 11).   By the late spring of 2002, Mr.

Mehlhorn had spent about eighteen days working on the SVRS project.

### C.    AOS and FS's Initial Interactions

Around the same time period, Mike Metzler ("Metzler"), AOS's marketing

manager, "saw an ad [for FS's products] in . . . *Pool and Spa News*," a trade

publication.  (Meltzer Dep. 73).   In April of 2002, intrigued by FS's Suction-Safe

Pump, as the product was "the only thing [he] saw . . . in the pump market that was

along the lines of" complying with potential regulations regarding pool suction

entrapment prevention, (Metzler Dep. 74), Metzler requested that AOS sales

representatives ask the Colorado company about the product.   Soon after,

conversations between FS's Cohen and AOS's Metzler occurred.  The exact subject

---

[13] The plaintiff disputes  DPFF ¶ 11, arguing that Mr. Mehlhorn did not "finish the concept development of the pool pump protection circuit until May 23, 2003."  (Pl.'s Resp. DPFF ¶ 11).  Of course, this does not contradict the defendant's proposed finding, as the finding states nothing about when Mr. Mehlhorn "finish[ed] the concept development of the pool pump protection circuit." Moreover, the court notes that the schematic submitted by the defendant, which the plaintiff does not dispute the authenticity of, indicates that the Mr. Mehlhorn crafted a schematic for a "pool pump suction detector" on September 19, 2001.   Civil Local Rule 56.2(b)(1) (in effect when the plaintiff filed its responses to the defendant's findings of fact) stated that materials in opposition to a summary judgment motion must include:  "A specific response to the movant's proposed findings of fact, *clearly delineating only those findings to which it is asserted that a genuine issue of material fact exists*. The response must refer to the contested finding by paragraph number and must include specific citations to evidentiary materials in the record which support the claim that a dispute exists."   The current rules and its corresponding comments echo this rule.   Civil L.R. 56(b)(4) ("The Court will deem uncontroverted statements of material fact admitted solely for the purpose deciding summary judgment.")  Here, the plaintiff has opted to ignore this rule.   Without a proper objection, a proposed finding will be deemed admitted for the purposes of the summary judgment motion.  Civil L.R. 56.

matter of the initial conversations between Cohen and Metzler is disputed,[14] but it is undisputed that those conversations: (1) did not result in any sort of formal arrangement between the parties; and (2) did not touch on the question of confidentiality regarding the information discussed between the parties.

Meanwhile, in May of 2002, AOS accelerated its efforts on Mr. Mehlhorn's SVRS project, as Mehlhorn and his supervisor, Ron Bartos ("Bartos"), and Metzler, "visited Sta-Rite Industries in Delavan, Wisconsin, to discuss potential solutions to the suction entrapment problems facing the swimming pool industry." (DPFF ¶ 12). The agenda for the meeting included "discussion on how Sta-Rite [understood] the current 'anti-entrapment safeguard' market conditions and future trends" and "Sta-Rite's relationship with" FS. (PPFF ¶ 154). The parties agree that FS's technology was discussed at this meeting.

That same month, Mehlhorn tested the well-pump motor he had been working on, with a "test setup consist[ing] of [the motor] and a barrel of water." (PPFF ¶ 142). Later tests were performed using a horse trough. During testing, although the exact date is disputed, Mehlhorn, after "rigorous analysis," concluded that the pump's "input power," as opposed to its "power factor," would be the most appropriate

---

[14] FS claims that AOS "first reached out to FS for assistance with designing a load-sensing pool pump motor." (PPFF ¶ 149). AOS claims that "Mr. Cohen had a few conversations with Mr. Metzler in 2002 regarding the possibility of AOS replacing Franklin Electric as the supplier of the motor for FS's Suction Safe system, but the conversations were limited due to FS's ongoing relationship with Franklin Electric." (DPFF ¶ 36).

means to measure a motor's load.[15] (Mehlhorn Dep. 121-22). In October of 2002, AOS's engineering department "recommended that [the pump protector circuit] be made a [formal] 'project' for 2003." (PPFF ¶ 157). In the late fall of 2002, Mr. Mehlhorn "began working to design a circuit to economically measure motor input power."[16] (DPFF ¶ 16). Mehlhorn, in his sworn testimony, identified schematics from the spring of 2003 that displayed the preliminary "circuit developments" used to create a device that measured motor input power. (Mehlhorn Dep. 137).

In November 2002, the plaintiff "terminated" its relationship with Franklin, and "as soon as" FS signed the termination agreement, Mr. Cohen called AOS's Metzler. (Cohen Dep. 10/21/09 218). After a few conversations between Cohen and Metzler,[17] on January 6, 2003, Cohen wrote to the AOS executive to formally inform AOS that "after experiencing [a] 25% failure [rate] in the field with the Franklin Loadtec Motor, we have elected to notify Franklin Electric Company that we are terminating our agreement with them." (Docket #122 Ex. 18). Moreover, the letter stated that FS "would like to go forward with [AOS's] development of [FS's] pump-protector pool pump motor." (Docket #122 Ex. 18). The January 6, 2003 letter also included a short "description of several desired features of a pump protector motor

---

[15] Mr. Mehlhorn's deposition testimony also indicates that he initially measured the motor's load through the motor's "power factor." (Mehlhorn Dep. 111). However, Mehlhorn concluded that several motors "don't have the characteristics that the power factor changes," (Mehlhorn Dep. 119), so the AOS engineer concluded motor input power was "the one to choose." (Mehlhorn Dep. 121).

[16] Plaintiff's dispute with DPFF ¶ 16 is not with the first sentence in paragraph 16.

[17] It is undisputed that none of these conversations formalized any agreement between the parties, nor touched on any confidentiality issues.

that could be supplied by AOS." (DPFF ¶ 37). The January 6, 2003 letter did not contain any discussion of confidentiality.

Mr. Metzler responded to Mr. Cohen's letter on January 16, 2003, writing that AOS "would be pleased to work and develop concepts for suction entrapment with" FS. (Docket #122 Ex. 19). Metzler further noted that AOS "already [has] some prototypes[18] at [the company's] Corporate Technology Center in Milwaukee." *Id.* AOS's marketing manager suggested a "meeting date to begin development together in 2003-2004." *Id.* Additionally, Metzler proposed an "18-month exclusivity" period "once the first shipment occurs." *Id.* Mr. Metzler closed the letter by stated that: "We look forward to setting a meeting date and beginning the process." *Id.* Mr. Cohen stated in his deposition testimony that he "assume[d] that when [he] got a letter from a major corporation like [AOS] . . . that [FS and AOS were] in a joint venture" and "had a fiduciary duty at that time." (Cohen Dep. 10/21/09 221). No letters or documents stated that FS and AOS were actually in a joint venture at that time, nor can FS point to any words expressed by AOS to indicate that they were in a joint venture with FS.

---

[18] In an attempt to further dispute the indisputable, FS takes issue with AOS's thirty-ninth proposed finding. However, that finding of fact merely quotes directly from the January 16, 2003 letter and does not broadly assert any facts other than the content of the letter. FS disputes the fact by attempting to explain what the letter truly meant. However, there is no dispute with what the actual contents of the January 16, 2003 letter were.

## D.     AOS's Efforts in Developing a Motor for FS

In the months that followed, FS and AOS had numerous conversations to discuss AOS developing a motor for FS.  Mr. Cohen asserts that those conversations implied that the companies were "moving forward in a joint venture." (Cohen Dep. 10/21/09 223) ("We discussed the fact that . . . we were moving forward in a joint venture.").  Mr. Metzler testified that the conversations were "strictly" related to AOS "developing a motor for his pump." (Metzler Dep. 85).  On March 10, 2003, Mr. Cohen sent Mr. Metzler a letter described internally as a "project outline for the development of a new 'Pump-Protector Motor,'[19] designed to eliminate common operational problems which are destructive to centrifugal pumps, as used for the circulation of water in aquatic facilities." (Docket #122 Ex. 17).  The letter initially provided AOS "background" on FS's history with Franklin, noting that the motor developed by Franklin was "unreliable, as 25% failed in the field," and "required too much current to operate in normal conditions."  *Id.*  The letter further "summarized FS's desired features for a load-sensing motor," (DPFF ¶ 40), such as "dry-run protection," "soft-starting," a "notched end bell," "leak protection," and a "corrosion-proof motor case." [20]  (Docket #122 Ex. 17).  The letter also included over twenty pages of "test results of the Franklin Loadtec Pump Motor," which included the "trigger points" for the Loadtec motor at which the motor would cease to

---

[19] Notably, the letter did not say the parties were actually developing a load-sensing motor.

[20] The letter noted that the latter two features were "optional."  (Docket #122 Ex. 17).

operate.[21]  *Id.*  The parties dispute what other information the test results provided.[22]

Mr. Cohen testified that, after he sent the March 10, 2003 letter, he discussed in

more detail the data map with Mr. Metzler. (Cohen Dep. 10/21/09 223).  Nothing in

the March 10, 2003 letter indicates the letter or its accompanying test results were

meant to be confidential.  Moreover, FS does not provide any evidence that Mr.

Cohen affirmatively told Mr. Metzler to treat FS's information as confidential during

any of their conversations.[23]  Additionally, nothing in the March 10, 2003 letter

provides evidence of any sort of agreement to go forward with the project by the two

parties.

On March 31, 2003, Mr. Cohen traveled to Milwaukee to meet Metzler and

several of AOS's engineers, including Jaime Watkins ("Watkins"), Mr. Mehlhorn, and

Mr. Bartos.   During the meeting, FS's president signed AOS's "standard

confidentiality agreement." (DPFF ¶ 43).  The confidentiality agreement pledged that

FS, as a "supplier of research consulting services," would "maintain confidential for

a period of fifteen . . . years from the date [of the agreement] all information" made

available to FS by AOS.  (Docket #157, Ex. TT).  Notably, there was no similar

---

[21] The parties refer to this test data as the "data map."

[22] AOS states that the data "contained basic measurements of various motor and pump characteristics such as voltage, amperage, flow, and power that are typical of such tests in the pump industry."  (DPFF ¶ 96).  FS, on the other hand, contends that such data "does not show" such characteristics.  As will be noted in the discussion section of this order, what the data map actually told AOS is largely irrelevant to this court's final decision.

[23] The lack of any expressions by FS to AOS to keep FS's information confidential is confirmed by the deposition testimony of Bill Schlanger ("Schlanger"), FS's Chief Financial Officer. (Schlanger Dep. 241).

agreement requiring that AOS would maintain the confidentiality of information provided by FS to AOS, despite the fact that "FS, through Mr. Cohen, had entered into other various confidentiality agreements [protecting FS's intellectual property rights] prior to his work with AOS."[24] (DPFF ¶ 99). FS, however, as it had done in its relationship with Franklin, opted to share information with AOS without a confidentiality agreement protecting the Colorado company's information.

In addition to signing the confidentiality agreement at the meeting, FS shared information regarding what features the Colorado company thought "would be important . . . to have in the" device, discussed the desired features of the product as outlined in the March 10, 2003 letter, and then had discussions with and made recommendations to AOS regarding the "hydraulic rationale for [the] features [in the device], how to correct [AOS's] test stand,[25] and how to test any prototype." (PPFF ¶ 171). Moreover, the parties "discussed the features of the Loadtec at the March 31, 2003 meeting." (PPFF ¶ 172).

The parties' proposed findings focus considerably on Mr. Mehlhorn's impressions regarding the March 31, 2003 meeting, presumably as evidence of the

---

[24] "For example, in 1998, FS entered into a three-year mutual non-disclosure agreement with Sta-Rite Industries, Inc." (DPFF ¶ 100). In 2001, FS entered into a "confidentiality agreement with DCC in 2001, a pool company in Dallas because DCC 'wanted to know more about the product' and [Mr. Cohen and Mr. Schlanger] weren't comfortable discussing it without a confidence agreement." (DPFF ¶ 101). Moreover, FS signed a confidentiality agreement with a "good friend" who owned a large pool service company that was doing business with FS because, as Mr. Cohen testified, "people that are privy to what [FS is] is developing generally sign confidence agreements . . . with the company." (Cohen 11/20/09 Dep. 125). Mr. Cohen testified that in hindsight he "wished he had" signed a similar agreement with AOS. *Id.*

[25] FS asserts in PPFF ¶ 173 a series of flaws that AOS's test stand had.

nature of the relationship between FS and AOS at the time of the meeting. The

court notes before discussing Mr. Mehlhorn's impressions of the meeting that Mr.

Mehlhorn is an engineer for AOS and quite readily admitted in his testimony that he

was "not familiar with business issues" at AOS. (Mehlhorn Dep. 157). AOS's

engineer stated in his deposition testimony that he "found out" at the meeting that

"high fail rates" with the motors produced by Franklin created a "desire to get some

kind of business relationship between the two companies," prompting the meeting.

(Mehlhorn Dep. 177-78); (PPFF ¶ 174). Mehlhorn answered affirmatively to a

question asking him if it was "ever explained to you that you would be working with

[FS] to develop" the pump protector motor. (Mehlhorn Dep. 158). However, Mr.

Mehlhorn clarified his statement later in the deposition with the following dialogue:

> Q Was your understanding that you were going to work together
> with Joe Cohen?
> A In a sense, yes.
> Q What do you mean by "in a sense"?
> A Well, he was going to test whatever we came up with, and he
> was going to provide the Franklin motor to kind of set up a
> baseline for what it is we needed to do, so there was definitely
> materials going back and forth.
> Q And was it a – you know, were you jointly developing a particular
> product or – yeah, were you jointly developing a particular
> product?
> . . .
>
> A It was more on A.O. Smith to develop the motor to replace the
> Franklin.
> Q Did you work together on any aspects of the circuit board?
> A No.
> Q Did Joe provide any input into the development of the circuit
> board?
> A No.

(Mehlhorn Dep. 202).[26]  Mr. Mehlhorn later described the project as an endeavor where "AOS [was] preparing [a] product prototype for FS to replace the Franklin motor."[27]  (Mehlhorn Dep. 220).

Following the March 31, 2003 meeting, Mr. Mehlhorn contacted Mr. Cohen to discuss "vacuum spike issues" and the "test stand." (PPFF ¶ 177).  With regard to the test stand, Mr. Cohen "suggested that AOS make the test stand adjustable to simulate different pump heights relative to the pool, increase the length of piping in its test stand, install a vacuum gauge, and add a valve to the suction side of the pump." (DPFF ¶ 82).  In doing so, Mr. Cohen noted the "technical standards promulgated by" the American Society of Mechanical Engineers ("ASME") and the Association for Testing and Materials ("ASTM") "related to the requirements for testing and implementing SVRS systems." (DPFF ¶ 83).  FS has not presented any evidence suggesting that Mr. Cohen told Mr. Mehlhorn that their conversations would be confidential.

---

[26] FS opted to only cite to the first half of the above dialogue in their proposed findings of fact to the court.  (PPFF ¶ 175).

[27] The parties also direct the court to internal documents from AOS, specifically slides from a April 15, 2003 presentation on "Pump Motor Controls," that state that "AOS has [sic] working agreement with Fail Safe Pumps." (Docket #157, Ex. ZZ).  PPFF ¶ 195 state that the slides also had the language "Project evolved to working with Fail-Safe to develop a 'dry -running' pump protecting device – This motor is part of Fail-Safe's SVRS system." The court scoured the citations provided by the plaintiff to support the claim that the latter language was included in internal documents of AOS.  The court could not find such language in the documents.  The plaintiff, for future filings with this court, should not cite to a general series of bate stamp numbers, hoping that the court will be able to find the information in question.  Regardless of whether this evidence exists, its largely duplicative of the first piece of evidence that FS cites.  The court will discuss the relevance of this evidence in the discussion section of this order.

In April of 2003, "Mr. Cohen provided AOS one of its publically available Suction-Safe pumps with a Loadtec motor for testing purposes." (DPFF ¶ 46). Mr. Mehlhorn tested the Franklin motor "in April and May."[28] (PPFF ¶ 178). By August of 2003, Mr. Mehlhorn and Mr. Cohen discussed AOS's efforts, contemplating "whether [a] product would be available in time for the next swimming pool season." (PPFF ¶ 181). One month later, Mr. Mehlhorn "made arrangements to send a prototype [of the motor] to Mr. Cohen . . . for testing on Cohen's test stand." (PPFF ¶ 182). In October of 2003, Mr. Mehlhorn continued to work on the project, recognizing "various mistakes and problems." (PPFF ¶ 183). By late October 2003, Mehlhorn had reported to Mr. Cohen that a prototype of the motor "would be shipped to [FS] in a couple of weeks." (PPFF ¶ 184). Mr. Mehlhorn also reviewed Franklin's patents to ensure that there were "no patent infringement issues." *Id.* An inter-office weekly report dated October 31, 2003, from Mr. Mehlhorn to Mr. Bartos states that "as far as we know, all the functions Joe Cohen needs for his testing are operational." (Docket #157, Ex. C). There is no evidence that Mr. Mehlhorn was actively talking with upper-management at AOS, such as Mr. Metzler, at this time, nor is there any evidence that Mr. Mehlhorn knew at the time in question of the exact relationship FS had with AOS. (Mehlhorn Dep. 157, 220).

---

[28] Mehlhorn's "testing" of the motor included checking the motor's "performance for shutting off under reduced flow," checking the motor's ability to satisfy one of the features FS had indicated it wanted in its motor at the March 31, 2003 meeting. (Mehlhorn Dep. 205). AOS's engineer also conducted tests determining what the "trip points" for the motor were and whether the motor had "soft start" capabilities. (PPFF ¶ 180).

## E.      FS's Proposal to Develop a Stand-Alone SVRS Motor

On September 22, 2003, Mr. Cohen wrote to Steve O'Brien ("O'Brien"), an executive at AOS, with the purpose of "communicat[ing] a clear understanding of [FS's] perspective of the swimming pool pump motor development project in progress between our companies." (Docket #122, Ex. 21). First, Mr. Cohen summarized the relationship of the companies to date, stating that because FS was "experiencing an untolerable [sic] failure rate with the Franklin motor, [the company] terminated [the] agreement with Franklin." *Id.* FS's president further stated that he had "contacted Mike Metzler," who had "presented that [AOS] was ready and willing to immediately begin to develop [a] new swimming pool pump motor under [FS's] direction" to replace the Loadtec motor. *Id.* Mr. Cohen also referenced Mr. Metzler's January 16, 2003 letter and FS's visit to Milwaukee. Next, the September 22, 2003 letter shifts focus, stating that Mr. O'Brien had "informed [Cohen] that [AOS] is interested in promoting" the product that they had been working on as a "life saving device," as opposed to a "pump protecting device." *Id.* Mr. Cohen then wrote that "if [AOS] is willing to market this new motor as a stand-alone . . . SVRS . . . [FS] would be very much in favor of that." *Id.* Then, Mr. Cohen issued a formal "proposal to move forward and commercialize," stating the following:

> At this point in time, our companies will need to enter into a formal Agreement to proceed with the development of this pump motor as an SVRS. Presently, *Fail-Safe has not granted any rights to AO Smith for the commercial use of any proprietary intellectual property, developed and owned by Fail-Safe, and there is no formal agreement in place between our companies.*

*Id.* (emphasis added). Mr. Cohen concluded his letter by listing ten formal points to a potential agreement between the companies with respect to developing the pump as a SVRS.[29]

### F.    The Decline of FS's and AOS's Relationship

It is unclear if AOS ever formally responded to Mr. Cohen's September 22, 2003 proposal. Moreover, the parties dispute the exact nature of conversations that took place in late 2003. Mr. Schlanger testified that in "late December" Mr. O'Brien called Schlanger to tell him that, per a conversation with AOS's legal department, the "project" invited "too much liability" and that AOS was "cancelling this project." (Schlanger Dep. 275-76). Mr. O'Brien disputes that this conversation occurred and claims that in "early 2004" he was informed by Mr. Schlanger "that [FS] had chosen not to continue to invest in their valve." (O'Brien Dep. 89). However, it is undisputed that in January 2004 Mr. O'Brien "asked Mr. Mehlhorn to not talk to [FS] anymore." (PPFF ¶ 200).

Starting in January of 2004, a series of letters led to the demise of the working relationship between the parties. On January 2, 2004, Mr. Cohen sent a letter to seventeen different pump manufacturers, stating that "pump manufacturers must act now to protect the pool industry as well as the swimming public" to prevent suction

---

[29] In response to AOS's proposed finding citing to the September 22, 2003 letter, FS "disputes" the finding, saying that the "The parties corresponded with each other over several months regarding the ongoing development of the load-sensing swimming pool pump motor." (Pl.'s Resp. DPFF ¶ 51). However, FS's is not disputing the validity of the September 22, 2003 letter.

entrapment.  (Docket #122, Ex. 22).  The letter noted in bolded font that:  "We have developed the solution."  *Id.*  The letter further asserted that "in conjunction with [AOS] . . . we have developed a load-sensor pump motor." *Id.*  The letter closed by inviting pump manufacturers to contact AOS to express support for the load-sensor motor.

On January 19, 2004, Mr. O'Brien responded to Mr. Cohen's January 2, 2004 letter, writing to the pump manufacturers that Mr. Cohen's "letter contain[ed] inaccuracies [AOS] believes must be corrected," as the letter did not "reflect the opinions of AOS or its employees" and was "written without any consultations with or participation of anyone" at AOS.  (Docket #122, Ex. 23).  First, AOS noted that despite FS's claims that it was working with AOS to develop a load-sensor pump motor, "the only arrangement between [the parties] involves [AOS] agreeing to consider development of a pump protector motor."[30]  *Id.*  The letter further disputed FS's claims that a motor was designed that would pass the latest standards for SVRS technology and that prototype motors are "already constructed and waiting to be tested."  *Id.*  Finally, the letter concluded that "developing an electronic pump shut off device to the point that it is ready to manufacture would take months or even years in our estimation."  *Id.*  Mr. O'Brien also sent a letter directly to Joe Cohen with respect to his January 2, 2004 letter.  (Docket #155 Ex. 24). The letter noted that

---

[30] The letter asserted that the scope of the project was "limited to developing a device to protect the motor form a dry pump condition by sensing the loss of flow and shutting off the pump." (Docket #155 Ex. 23).

"the only project between [FS] and [AOS] involves [AOS] agreeing to consider developing a 'pump protector pool motor.'" *Id.* The letter further accused Mr. Cohen of breaching the March 30, 2003 confidentiality agreement and insisted that Cohen "cease further communication about this project immediately." *Id.* The January 19, 2004 letter also noted that the confidentiality agreement contained language that inventions conceived of as a result of the joint efforts of the company are "the property of" AOS. *Id.* Finally, the letter closed by clarifying that: (1) AOS had "not yet determined that a load sensor device, when used with a motor and a pump, is a viable method for reducing the occurrence of suction entrapment"; and (2) "the only device [AOS has] agreed to develop for [FS] is the dry running pump motor protector device, and [AOS] has not yet delivered prototypes to [FS]." *Id.*

The correspondence between the two companies became even more heated with a January 22, 2004 letter from Mr. Schlanger to Mr. O'Brien. (Docket #122, Ex. 25). Schlanger began the letter by stating "We are glad to see that you like our intellectual property enough to claim ownership of it for yourself." *Id.* Schlanger then opted to "revisit the facts" of FS's work with trying to develop SVRS devices. Specifically, Schlanger noted that AOS "approached [FS] in 2002, to see if [FS] would direct the development of an [AOS] motor with similar features" to that of the Franklin Loadtec motor. *Id.* The letter further asserted that after FS's relationship with Franklin ended, FS "contacted Mike Metzler . . . to see if the Company was still interested in developing the [pump-protector] motor." *Id.* The letter continued by

stating that FS, through Metzler's January 16, 2003 letter, could "claim rights to the 'pump protector motor.'" *Id.* The letter then disputed the validity of the confidentiality agreement signed by Joe Cohen, stating it was "never executed by [AOS], and "there was no valid consideration." *Id.* Mr. Schlanger's letter further noted that "even if" the confidentiality agreement is valid, it would not "cover" any inventions conceived of in 1999, before the parties contemplated working on a pump protector motor. Finally, the letter stated that FS was "elect[ing] to withdraw [its] offer of licens[ing] out technology to [AOS] made in" the September 22, 2003 letter. *Id.* Schlanger warned AOS that FS was "pursuing a U.S. Patent on [the] technology." *Id.* The letter closed with Schlanger ominously stating that "perhaps another motor company will be interested in acquiring technology that could allow them to increase their pool industry share." *Id.* It is unclear if there were any letters from AOS to FS directly responding to Mr. Schlanger's January 22, 2004 letter.

There is evidence in the record, however, that Mr. O'Brien, in phone calls to Mr. Schlanger in February of 2004, "represent[ed] that [AOS had] decided to move forward with the load sensor SVRS motor." (Docket #122, Ex. 27). On February 23, 2004, an internal memorandum written by Mr. O'Brien provided an "update" regarding AOS's dealings with FS. The memorandum stated the following:

> Dave Price (AOS patent legal council [sic]) has advised we should get a copy of [FS's] patent. To obtain this, I have spoken with [Schlanger] and told him that if he had a patent that applies to our device, we would be more inclined to work with [FS] than to dispute their claim. Bill advised me that they only filed a "provisional patent" which allows them to reduce the concept to patent within one year . . . I am more

convinced than ever that they have nothing that applies. They are also out of funding, which means Joe is available on a fee basis to help with testing and coordinating through [relevant industry standards] if we need him.

(Docket #157, Ex. KKK). Testimony from Mr. O'Brien further supports that AOS was actively determining whether to "involve" FS in the project, depending on the validity and merits of FS's patent rights. (O'Brien Dep. 194-95).

The following day, Mr. Schlanger sent another letter to Mr. O'Brien. (Docket #157, Ex. UU). Schlanger, referencing dialogue between the parties that apparently occurred since the January 22, 2004 letter was written, thanked Mr. O'Brien "for keeping [FS] advised on the status of [the] product development project," as O'Brien had "indicated that [AOS] had decided to move forward to commercialize the new load sensor swimming pool pump motor." *Id.* Mr. Schlanger further stated that FS was "ready and willing to assist [AOS] with the development of this new motor," but "in order for [such a project] to move forward, [FS] feel it imperative that [FS] enter into an agreement with [AOS] which honors [the plaintiff's] intellectual property rights." *Id.* FS's Chief Financial Officer asked Mr. O'Brien to consider several points when "evaluating [FS's] stake in [the] project," including that FS "applied for US patent protection . . . for the use of . . . any load sensor device as a means of providing a [SVRS]" and that "[AOS] clearly approached [FS] to head up design of this new motor." *Id.* Moreover, Schlanger asserted that the "lifesaver motor," while "programmed differently" and is a "different product" from the "pump protector motor" that the parties "originally set out to develop," "utilizes [FS] intellectual property" and

is, therefore, "clearly covered under [the] agreement" providing FS "with the first 18 months of marketing rights once the motor is commercially available." *Id.* The letter closed with the statement that: "We would like to work with [AOS] as a team to develop this new motor and bring it to market as quickly as possible." *Id.* That same month, FS, through Mr. Cohen, issued a press release stating that the company had "applied for US Patent protection for the use of an electrical load sensor as a [SVRS]." (Docket #157, Ex. UU).

In the spring of 2004, "Mr. O'Brien contacted [FS] to discuss the technical side of the project and relevant legislative proposals." (PPFF ¶ 209). "O'Brien stated that he would prepare a proposal to memorialize the parties' ventures and forward it to FS." (PPFF ¶ 210). "Shortly thereafter, Mr. O'Brien told Mr. Schlanger that he had drafted an agreement for" FS and had given it to AOS's "legal department to review." *Id.* AOS never provided a formal proposal to FS, however. (Schlanger Dep. 293).

Around the same time period, in April of 2004, Mr. O'Brien authored an internal AOS memorandum entitled "Pool Pump Load Sensor Device: Project Plan," discussing, in relevant part, the defendant's relationship with FS. Specifically, the memorandum read:

> [AOS] began development of the [load sensing motor] device several years ago, and began working with [FS] in 2002 since this organization appeared to be most involved in developing protective devices, namely their automatic shut off valve. [FS] convinced AOS that the best approach for AOS would be to only market the motor as a pump dry-running protection device to be used in conjunction with the [FS] pump and valve. As testing of the AOS device evolved, it became apparent to [FS] and AOS that the electronic shut off device could be used *in*

-25-

*place* of the [FS] valve, eliminating the need for the valve. Since that time, [FS] has attempted to claim rights to the AOS concept. At this time, there is no compelling reason to include [FS]; they would only drive up the price of the device, but at some point their development expertise may be utilized.

(Docket #157, Ex. UU). Internal documents also indicate that AOS was concerned that FS had expressed a "belie[f that] they have a patent of the motor concept and [a desire] to be paid royalties." *Id.* The same documents show that AOS was planning on "reject[ing FS's] request" for royalties, but did leave open the possibility that AOS would "keep [FS] involved since this company is considered the biggest advocate of suction protection." *Id.*

In July of 2004, Mr. O'Brien stated that "he would fly to Denver, Colorado to meet with [FS] to discuss the financial details of [a potential joint-]venture and execute the agreement."[31] (PPFF ¶ 211). However, the following day, Mr. O'Brien changed his mind and stated that he would not be coming to Denver. *Id.* The parties' impasse lingered into the fall. On October 13, 2004, Mr. Schlanger emailed Mr. O'Brien, "check[ing] with [him to] see how the SVRS Motor project was progressing." (Docket #155 Ex. S). Schlanger also asked in the email whether AOS was "still planning to roll [the SVRS motor] out at [a trade] show in Las Vegas." *Id.* Two days later, Mr. Schlanger reached Mr. O'Brien by phone, and Mr. O'Brien "declined to discuss any potential work with FS."[32] (DPFF ¶ 58). At Mr. Schlanger's

---

[31] Mr. O'Brien testified that AOS was prepared to offer FS a royalty payment that was about $2 per unit sold. (O'Brien 30(b)(6) Dep. 96).

[32] FS's dispute with the DPFF ¶ 58 is not with the substance of the quote used by the court.

deposition, he responded affirmatively to the question of whether on October 15, 2004, he "knew things weren't going to work out the way [FS] wanted" with AOS. (Schlanger Dep. 314). There are no other documents that the parties cite to the court regarding any formal communications between Schlanger or Cohen and O'Brien or Metzler after October 2004.[33]

### G.    The eMod and the Guardian

In December of 2004, "AOS introduced" a product called the eMod at the "National Pool and Spa Expo and began selling the eMod in May of 2006." (DPFF ¶ 60). There is no evidence in the record that FS attended the 2004 Pool and Spa Expo. Moreover, FS did not obtain a physical sample of the eMod motor until 2006. However, AOS's introduction of the eMod was a not a complete surprise for FS, as there is plenty of evidence in the record showing that FS knew that AOS had crafted a load sensor pump using FS's alleged trade secrets as early as 2004.[34] Mr. Cohen stated emphatically in his November 20, 2009 deposition that he knew AOS had a "prototype load sensor pump motor built" in October of 2004, as Mr. Mehlhorn had informed FS of such information. (Cohen Dep. 11/20/09 145). Moreover, Cohen noted that the "prototype that Bill Mehlhorn built was using . . . [FS's] trade secrets."

---

[33] The defendant cites to letters dated November 17, 2005 (Docket #173 Ex. 2), and January 3, 2006 (Docket #173 Ex. 3), which are letters from FS to upper executives of AOS and AOS's legal counsel. At the date of the letters, any sort of business relationship, if one ever existed, between the two parties had ceased.

[34] The court notes that the plaintiff's do not dispute the substance of the DPFF ¶¶ 65-66, but rather parrots its own findings that: (1) FS did not attend the December 2004 expo; and (2) FS did not obtain an eMod until 2006. As such, the findings are undisputed.

*Id.* Moreover, Mr. Schlanger testified that he was "justified in writing" letters in "early 2004" to AOS because the defendant was using "the information [FS] provided to" AOS as the "foundation for the development of its [load sensor] motor."[35] (Schlanger Dep. 313-14).

Later in the year and in the midst of this litigation, AOS introduced and sold the Guardian, another load-sensing pool pump motor. (Mehlhorn Dep. 266). Much of the proposed findings for each side involve whether the Guardian is a different product from the eMod.[36] What is undisputed, however, is that the Guardian is a load-sensing motor that will shut down due to a "loss of prime, flow-blockage, and dead-head." (PPFF ¶ 220). The Guardian is also programed to shut down within three seconds in the event of a loss of flow, to interrupt electrical power to the motor to shut down the motor, and to wait until the pump is primed before monitoring the motor's load. *Id.* However, Mr. Mehlhorn testified that the eMod and the Guardian

---

[35] FS contends that there is no difference between the eMod and the Guardian, and that "the distinction between the eMod and the Guardian is one of nomenclature only." (Pl.'s Resp. DPPF ¶ 62). The defendant, however, states that the two products "served the same niche in the market and were both used for suction entrapment, and were on a 'continuum.'" (Def's Resp. PPFF ¶ 217).

[36] FS's assertion relies in part on an email from Mr. Mehlhorn where he referred to the Guardian as "essentially the same as the old, but with some new and improved features." (Docket #157, Ex. U). The email does not explain what Mr. Mehlhorn meant by the phrase "essentially the same," but will instead rely more on his deposition testimony in determining whether there is an actual dispute regarding whether the Guardian and the eMod are only different because of their names.

are "not the same product."[37] (Mehlhorn Dep. 167). Regardless of whether or not the two products are the same product, both sides concede that the Loadtec, the eMod, and the Guardian all serve the same general function and, accordingly, have some similar features.

**H. What Information Did FS Provide to AOS for its eMod and Guardian Motors?**

The court's extended discussion of FS's and AOS's efforts to create a successful SVRS device begs the question of what information FS provided to AOS, prompting FS's April 11, 2008 complaint (Docket #1), alleging unjust enrichment, and misappropriation of trade secrets claims against the defendant. The complaint itself indicates that FS provided such information in the March 10, 2003 letter when Mr. Cohen provided Mr. Metzler with "an outline of potential new and innovative features that could be designed into the new pump motor as well as the proprietary data for the load-sensing and delay technology used on . . . [the] Loadtec motor." (Compl. ¶ 16). FS's unjust enrichment claim indicates that FS shared with AOS "proprietary hydraulic testing and operational procedures for a load-sensing, suction entrapment-preventative motor." *Id.* at ¶ 31. FS's misappropriation of trade secrets claim states that FS conveyed information relating to the "design and manufacture

---

[37] Specifically, Mr. Mehlhorn testified that the Guardian, while performing the same general functions of a load-sensing motor that serves as an anti-entrapment device, has a "second detection scheme" which is "more sensitive and faster" than that of the eMod. (Mehlhorn Dep. 167). The Guardian waits "two minutes after the motor is started to . . . allow an adequate time period for the pump to achieve full prime" before monitoring the motor's input power. *Id.* at 169. Moreover, the earliest versions of the eMod had a "soft-start" function, whereas the Guardian does not. *Id.* 171-72.

of a load-sensing, suction entrapment preventative pool pump motor."  *Id.* at ¶ 36.

The court scoured the record and the parties' proposed findings of fact, finding that

the following evidence supported FS's general claim that the plaintiff provided AOS

with information that was useful to AOS in producing its eMod and Guardian

motors.[38]

Mr. Mehlhorn testified that he incorporated into the initial 2003 version of the

eMod, because of a "discussion" with Mr. Cohen, two features that:  (1) removed

power from the system to enable the motor to restart; and (2)  "inhibited" the motor

from shutting down for two minutes after the pump is "powered on to allow the pump

to fully prime."  (Mehlhorn Dep. 217).  Mr. Mehlhorn further testified that during the

"early versions of the eMod" the motor had a soft-start function – a means by which

the motor would slowly accelerate at startup – that was inspired by a function on the

---

[38] The court notes that the plaintiff cited to the deposition testimony of two of its experts to support PPFF ¶ 191.  Both experts' testimony is at the broadest level of generality and is not particularly helpful for the court determining the undisputed facts at the summary judgment stage of these proceedings with respect to what information Mr. Cohen provided to AOS.  One expert testified that Mr. Cohen provided the initial "concept and research and development" for the load-sensing motor, but does not testify with respect to what concepts translated into AOS' product, as the expert had not examined AOS's motor.  (Nelik Dep. 255).  Another expert testified that the fact that the year Mr. Cohen provided test data to AOS was the same year AOS's development project with the SVRS motor "progressed" is evidence that Cohen provided a "substantial amount of contribution." (Neuhalfen Dep. 224).  The court notes that the expert testimony cited by the plaintiff in PPFF ¶ 191 is not evidence of what specific information FS provided to AOS.  For similar reasons, the testimony of Mr. Mehlhorn where, when pressed to answer the question in his deposition, he openly "speculates" that Mr. Cohen contributed five percent to the device AOS produced in January 2004 and one to two percent to the Guardian product is not helpful to the court's current inquiry and likely runs afoul of Federal Rule of Evidence 701, which requires that opinion evidence be "rationally based on the perception of the witness."

Franklin motor.[39]  *Id.* at 217-18.  Moreover, a specification sheet dated June 11, 2003, provides that the:  (1) power removal function; (2) shutdown inhibitor on startup function; and (3) the soft-start function, were all part of AOS's initial specifications for the design of its pool pump protector motor.[40]  These three features are the only specific features that the plaintiff argues and supports with evidence in its proposed findings as features on a device created by AOS that were even somewhat attributable  to the information that FS provided to AOS.[41]

FS asserts that the information the plaintiff imparted to AOS consisted of:  (1) "project outlines" provided in the January 6, 2003, and March 10, 2003 letters to

_____

[39] Mr. Mehlhorn testified that the soft-start feature, while "desire[d]" by Mr. Cohen was implemented in a manner that was "come up" with by AOS engineers.  (Mehlhorn Dep. 218).  Specifically, the Franklin motor had a "large mental flywheel" that allowed the soft-start feature to function, whereas AOS implemented their soft-start feature through an "electrical solution."  *Id.*  Mr. Mehlhorn further noted that the later versions of the eMod and the Guardian did not have a soft-start feature.  *Id.* at 217.

[40] The plaintiff claims in PPFF ¶ 192 that FS "taught" AOS to incorporate several features including ". . . the load sensor trip point at 66% of load."  While the evidence cited by the plaintiff does indicate that the sensor trip point was 66% of load, the cited evidence does not support the conclusion that FS "taught" AOS that trip point.  (Mehlhorn Dep. 220) ("QUESTION: Do you know whether the 66 percent of the underload is similar to or the same as the Franklin Electric motor? . . . WITNESS: I have no idea.")  Plaintiff's Exhibit XX merely demonstrates that the trip point of "pump unloading detector" was sixty-six percent, but does not indicate that:  (1) the pump unloading detector or the 66% trip point was FS's idea; or that (2) FS "taught" AOS how to set the 66% trip point.  (Docket #157, Ex. XX).  Moreover, its unclear to the court what the 66% trip point that is in the PPFF ¶ 192 refers to – it could be a measure of the motor's input power or of the motor's power factor.  As such, the court must conclude that the plaintiff has not supported its finding of fact with any evidence with respect to FS "teaching" AOS to incorporate a feature that included a load sensor trip point at 66%.

[41] In PPFF ¶ 215, the plaintiff finds that Mehlhorn stated that FS "contributed to the development of the eMod/Guardian technology."  For the reasons stated above, the cited testimony of Mr. Mehlhorn is not particularly helpful as it lacks any sort of specificity.  Moreover, the plaintiff cites to Exhibit GGG to support its finding, but that exhibit does not indicate that FS's information contributed to the eMod or Guardian products.

AOS that listed the specific features needed in the motor; (2) the general recommendations or "know how" provided orally by Mr. Cohen to AOS during meetings and phone calls regarding: (a) "the design features of the motor"; (b) the "rationale" for the features of the motor; (c) testing data; and (d) "how to construct a test stand to properly test a prototype";[42] (3) the "testing data" provided in March 10, 2003 letter;[43] and (4) the Suction Safe Pump FS provided to AOS for "use in developing the new motor in April 2003." (Pl.'s Resp. DPFF ¶ 69). Additionally, FS has provided expert testimony asserting the opinion that the information the plaintiff provided to AOS constitutes a "substantial amount of contribution" and allowed AOS "to create a functional prototype" of an anti-entrapment device, which became the precursor to AOS's eMod and Guardian products. (Neuhalfen Dep. 224).

The court also notes how AOS's products departed from the Loadtec motor and where AOS did not use FS's information when developing the eMod and the

---

[42] What the exact recommendations that Mr. Cohen provided regarding the test stand is unclear. It is undisputed that recommendations, such as the "length of pipe" or the "height of [a] pump" in the test stand, is contained in publically available standards promulgated by the ASME and the ASTM. (DPFF ¶¶ 83-85). FS asserts that, in addition to providing recommendations similar to those contained in the publically available industry standards, Mr. Cohen provided to AOS his general "understanding [of] the average swimming pool and how it reacts hydraulically and then affects the load-sensor." (Pl.'s Resp. DPFF ¶ 85). Mr. Cohen, in an affidavit filed with the court, lists the information "that cannot be found in either the ASTM or ASME standards" that he provided to AOS regarding how to successfully test a load-sensor pool pump motor, including "valving," "flow readings," "negative pressure readings," "positive pressure readings," "neutralizing the static head," "electrical power control," "electrical power monitoring," "electrical current monitoring," "electrical active power monitoring," and "test protocol." (Cohen Decl. ¶¶ 52-53). FS further contends that Mr. Cohen's recommendations helped AOS design a test stand that helped "develop the motor" as opposed to merely comply with "the standards." (Pl.'s Resp. DPFF ¶ 88).

[43] The parties dispute how useful the testing data was with regard to designing a motor. (DPFF ¶ 98; Pl.'s Resp. DPFF ¶ 98; DPFF ¶ 111, Pl.'s Resp. DPFF ¶ 111).

Guardian.  The later versions of the eMod and the Guardian did not incorporate the soft-start feature and changed the logic delay on startup.  (Mehlhorn Dep. 171). Moreover, neither the eMod or the Guardian have a "notched end-bell," *id.* at 172, a feature listed in FS's January 6, 2003, and March 10, 2003 letters to AOS.  While the record indicates that the initial test stand used by Mr. Mehlhorn in 2003 was changed per Mr. Cohen's recommendations (Mehlhorn Dep. 192-193; Docket #157, Ex. C), AOS's engineer testified that he changed the test tank and "kept making [his own] refinements" after FS's President provided his suggestions.  (Mehlhorn Dep. 239-40).  Additionally, in detecting and shutting off the motor in response to a loss of prime, the eMod and the Guardian do "not measure a change in power factor," like the Loadtec, but rather "measures the change in input power."[44]  (DPFF ¶ 108). Finally, Mr. Mehlhorn testified that he did not "use the data that [AOS] acquired from [FS regarding] . . . how to set" the Loadtec motor in developing the eMod or the Guardian.[45]  (Mehlhorn Dep. 210).  In fact, Mr. Mehlhorn testified that he had not seen the test data "until March of" 2007.  *Id.* at 200.

The court, satisfied that whatever facts are in dispute or not in dispute has been resolved by the court, proceeds to evaluate AOS's motion, made pursuant to Fed. R. Civ. P. 56, and determine whether there is any "genuine issue as to any

---

[44] FS fails to respond to the substance of DPFF ¶ 108, and, therefore, it is undisputed that the eMod measures an underload condition via input power.

[45] Mr. Mehlhorn does concede that he did test the Loadtec motor after FS provided one to him and tested the Loadtec trip points to "verify that the Franklin worked as it stated."  (Mehlhorn Dep. 212).

material fact" regarding whether: (1) FS's misappropriation of trade secrets claim should be dismissed in its entirety; and (2) FS's unjust enrichment claim should be "limited to any misappropriation occurring no later than December 2004." (Docket #121).

**DISCUSSION**

Summary judgment is appropriate where the "pleadings, the discovery, and disclosure materials on file, and any affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Wis. Alumni Research Found. v. Xenon Pharms., Inc.*, 591 F.3d 876, 882 (7th Cir. 2010). A genuine issue of material fact exists when a reasonable jury could find in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "The initial burden is on the moving party . . . to demonstrate that there is no material question of fact with respect to an essential element of the non-moving party's case." *Delta Consulting Group, Inc. v. R. Randle Constr., Inc.* 554 F.3d 1133, 1137 (7th Cir. 2009) (quoting *Cody v. Harris*, 409 F.3d 853, 860 (7th Cir. 2005)). Once the movant satisfies this initial burden, the burden then shifts to the non-moving party who "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Doe v. Cunningham*, 30 F.3d 879, 883 (7th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248). In ruling on a summary judgment motion, the court must view the evidence plus all inferences reasonably drawn from the evidence

in the light most favorable to the non-moving party. *TAS Distributing Co., Inc. v. Cummins Engine Co., Inc.*, 491 F.3d 625, 630 (7th Cir. 2007). With these standards in mind, the court looks to the specific allegations made by the plaintiff beginning with FS's misappropriation of trade secrets claim.

## A.    Misappropriation of Trade Secrets

FS's second claim for relief is that AOS misappropriated trade secrets "relating to the design and manufacture of a load-sensing suction, entrapment-preventative pool pump motor." (Compl. ¶¶ 35-41). AOS, in its briefs supporting its motion, raises a bevy of arguments for granting summary judgment on the trade secret misappropriation claim. The court begins by examining AOS's first argument – "FS's claim for misappropriation of trade secrets should be dismissed because it is time barred." (Def.'s Br. 14).

### 1.    Statute of Limitations Issue

Under Wisconsin law,[46] which adopts the Uniform Trade Secret Act ("UTSA"), an action claiming misappropriation of a trade secret must "be commenced within 3 years after the misappropriation of a trade secret is discovered or should have been discovered by the exercise of reasonable diligence." Wis. Stat. § 893.51. Moreover, "the unanimous conclusion of courts considering" the issue of when a

---

[46] The court notes that the law that will be applied in this case on all of the claims is Wisconsin law. In federal court, the choice of law is determined by the choice of law rules of the forum state. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941). When the parties do not dispute what law should be applied, the court should apply forum law. *Futuresource L.L.C. v. Reuters Ltd.*, 312 F.3d 281 (7th Cir. 2002).

claim for misappropriation of trade secrets arises for statute of limitations purposes have concluded that a claim arises "only once" – "at the time the *initial* misappropriation" is discovered. *Amalgamated Indus. v. Tressa, Inc.*, 69 Fed. Appx. 255, 261 (6th Cir. 2003) (emphasis added).[47]   The law, in turn, defines a "misappropriation of a trade secret" as either the acquisition of a trade secret through improper means or by "disclosing or using" the trade secret of another.   Wis. Stat. § 134.90.   FS only alleges that AOS "used" FS's trade secrets without its consent and does not claim that AOS acquired FS's trade secrets through unlawful means. (Compl. ¶ 39).  The question for the court, therefore, is whether FS commenced its action claiming a misappropriation of a trade secret within three years after AOS's initial "use" of FS's trade secret was "discovered or should have been discovered by the exercise of reasonable diligence."

Slightly complicating matters is the fact that the parties entered into a "tolling agreement" on November 29, 2007, whereby AOS agreed that the time from the date of the agreement until January 15, 2008, would "not be counted in determining the time in which [FS] . . . shall be required by any applicable statute of limitations . . . to file an action against" AOS.  (Docket # 122, Ex. 32).   The tolling agreement specifically stated, however, that the agreement would not "impact any of [AOS's] statute of limitations . . . defenses that may have accrued as of the date of [the]

---

[47] The court will utilize throughout this order the decisions of other courts interpreting the UTSA, as Wisconsin law on trade secrets "shall be applied and construed" to effectuate the UTSA's general purpose "to make uniform the law relating to misappropriation of trade secrets among states enacting substantially identical laws."  Wis. Stat. § 134.90(7).

agreement or that may accrue after the termination of this agreement." *Id.* The parties belatedly provided the court with additional tolling agreements that indicated the tolling period was extended until April 11, 2008. On April 11, 2008, the plaintiff filed its complaint. (Docket #1). Accordingly, the issue for the court changes slightly, as the court must determine on summary judgment whether there are disputed facts regarding whether FS "discovered or should have discovered" AOS's initial "use" of FS's trade secrets by November 28, 2004, three years prior to the date of the first tolling agreement.

That issue, of course, begs the further question of what a "use" of a trade secret entails, as the initial use is the touchstone for when the statute of limitations period begins. Unfortunately, the word "use" is "rarely defined" in trade secret case law, 1 Roger M. Milgrim, *Milgrim on Trade Secrets* § 1.01 n.72 (2010), and the parties made no attempt to clarify the issue for the court. However, as the *Restatement (Third) of Unfair Competition* (herein "*Restatement*") explains, "misusing" a trade secret is quite a broad concept:

> There are no technical limitations on the nature of the conduct that constitutes "use" of a trade secret . . . As a general matter, any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a "use" under this Section. Thus, marketing goods that embody the trade secret, employing the trade secret in manufacturing or production, relying on the trade secret to assist or accelerate research or development, or soliciting customers through the use of information that is a trade secret all constitute "use."

*Restatement* § 40 cmt c; *see generally Penalty Kick Mgmt. v. Coca Cola Co.*, 318 F.3d 1284, 1292 (11th Cir. 2003) (finding it "prudent to consult the *Restatement* for guidance to determine what constitutes . . . 'use' under the" UTSA).  Accordingly, the court will need to determine whether there is a dispute regarding whether FS "discovered" an initial "use" of its trade secrets by AOS  – such as AOS "employing [FS's] trade secret in manufacturing or production" or AOS "relying on the trade secret to assist or accelerate research or development" of AOS's products – on or before November 28, 2004.  *Restatement* § 40 cmt c.

While the court has explored what a "use" of a trade secret can be, the court must also examine what the word "discovers" means for purposes of determining the date FS's claim arose.  The Seventh Circuit, in *Sokol Crystal Prods. v. DSC Communications Corp.*, 15 F.3d 1427 (7th Cir. 1994) (interpreting Wisconsin law), explained that, in order to "discover" the misuse of a trade secret, a plaintiff must have more than an "abstract concern" or mere "suspicions and fears" of misuse of their trade secret.  *Id.* at 1430.  Rather, the statute of limitations on a trade secret misappropriation claim does not begin to run until a plaintiff has sufficient information to make a "meaningfully colorable" claim.  *Porex Corp. v. Haldopoulos,* 284 Ga. App. 510, 515 (Ct. App. 2007);  *see also Chasteen v. UNISIA JECS Corp.*, 216 F.3d 1212, 1218 (10th Cir. 2000) (holding that the statute of limitations on trade secret misappropriation claims begins to run when the plaintiff possesses knowledge of sufficient facts from which a jury has the possibility of inferring misuse of the

plaintiff's trade secrets); *Knights Armament Co. v. Optical Sys. Tech., Inc.*, 636 F. Supp. 2d 1283, 1293 (M.D. Fla. 2009) ("Although suspicion alone is insufficient to run the limitations period, 'when there is reason to suspect that a trade secret has been misappropriated, and a reasonable investigation would produce facts sufficient to confirm this suspicion (and justify bringing suit), the limitations period begins, even though the plaintiff has not conducted such an investigation.'")(internal citations omitted). A "meaningfully colorable" claim is one in which the lawsuit "could survive a motion to dismiss for failure to state a claim." *In re Cygnus Telecomms. Tech.*, 536 F.3d 1343, 1357 (Fed. Cir. 2008) (interpreting Minnesota's version of the UTSA).

Applying these various principles to the case at hand, the undisputed evidence confirms that FS knew of or should have discovered AOS's initial alleged trade secret misappropriation before November 28, 2004. FS's September 22, 2003 letter suggesting the parties "enter into a formal agreement to proceed with the development" of the pool pump motor as an SVRS device explicitly stated that FS had "not granted any rights to [AOS] for the commercial use of any proprietary intellectual property." (Docket #122, Ex. 21). Mr. Cohen admitted in his deposition that Mr. Melhorn informed FS in October of 2003 that AOS had built a "prototype load sensor motor." (Cohen 11/20/09 Dep. 145). Given: (1) the lack of any agreement between FS and AOS for the latter company to use the plaintiff's proprietary information to develop an SVRS; and (2) FS's unwavering belief that

AOS could not have produced a load-sensor motor without FS's help, Mr. Mehlhorn's disclosure in October of 2003 placed FS on clear notice that AOS was "employing" FS's proprietary information in manufacturing or producing a load sensing motor and "relying" on FS's information to "assist and accelerate" AOS's research and development of the SVRS device, a clear "use" of FS's trade secrets. *Restatement* § 40 cmt c. Moreover, FS admitted without any qualifications in its January 2, 2004 letter to its manufacturers that AOS was employing FS's information to "develop the solution" to pool suction-entrapment through a load-sensing motor (Docket #122, Ex. 22) – a stark claim, given that FS knew that AOS had "not granted any rights to [the defendant] for the commercial use of any proprietary intellectual property." (Docket #122, Ex. 21). Additionally, Mr. Schlanger's letter to Mr. O'Brien on January 22, 2004, formally accused AOS of "claiming ownership" of FS's "intellectual property."[48] (Docket #122, Ex. 25). Even more blatantly, Mr. Schlanger thanked Mr. O'Brien in his February 24, 2004 letter "for keeping [FS] advised on the status of [the] product development project," referencing the fact that Mr. O'Brien informed FS that the defendant "had decided to move forward to commercialize the new load sensor swimming pool pump motor." (Docket #157, Ex. UU). Furthermore, Mr. Schlanger's

---

[48] The court finds that no reasonable jury could conclude that such a letter was sent on a mere whim or based on pure speculation. In this way, this case is strikingly similar to *Phillips v. AWH Corp.*, 376 F3d 1382 (Fed. Cir. 2004), where the Federal Circuit agreed that a plaintiff's claim of trade secret misappropriation was time-barred based on letters that the plaintiff sent to the defendant accusing the defendant of "stealing" the claimant's technology. The court notes that *Phillips* was vacated to allow for *en banc* hearing on the issues; however, the *en banc* court specifically affirmed the portion of the earlier opinion holding that the misappropriation claims were time-barred. *Phillips v. AWH Corp.*, 415 F3d 1303, 1328 (Fed. Cir. 2005).

October 13, 2004 email to Mr. O'Brien confirms that FS knew about AOS's "SVRS Motor project," as Mr. Schlanger openly asked how the project was "progressing" and if AOS was "still planning to roll [the SVRS motor] out at [a trade] show in Las Vegas." (Docket #155 Ex. S). Finally, both Mr. Cohen and Mr. Schlanger unabashedly admit in their deposition testimony that they "knew" that AOS was producing a load-sensing motor using the information FS had provided in the summer and fall of 2004. (Cohen Dep. 11/20/09 145; Schlanger Dep. 313-14). None of the evidence suggests that FS had a mere "abstract concern" or slight "suspicion" that AOS was misappropriating FS's trade secrets; indeed, FS openly admitted it knew that AOS was using FS's trade secrets well before November 28, 2004.

The only argument that FS makes in rebuttal is that even though it "knew" that AOS was using FS's trade secrets in 2004, FS was only "speculating" about AOS's use in 2004 and could not confirm such use until FS inspected the AOS's eMod motor. (Pl.'s Resp. Br. 12). There are several problems with FS's contention. First, as discussed above, there is no evidence that FS was "speculating" about AOS's alleged misappropriation of FS's trade secrets in 2004: FS was emphatic, whether in its letters from 2003 and 2004 or in the deposition testimony of Mr. Cohen and Mr.

Schlanger, that it "knew" AOS had misappropriated FS's trade secrets in 2004.[49]

The only "evidence" that FS has presented contradicting the premise that FS knew

of AOS's misappropriation in 2004 is the affidavit of Mr. Cohen concluding that FS

"did not know that [AOS] had misappropriated [FS's] trade secrets until we inspected

and tested the actual functioning of the eMod motor in May of 2006." (Cohen Decl.

¶ 57). However, it is axiomatic that "parties cannot thwart the purposes of Rule 56

by creating 'sham' issues of fact with affidavits that contradict their prior depositions."

*Bank of Illinois v. Allied Signal Safety Restraint Systems*, 75 F.3d 1162, 1168 (7th

Cir. 1996); *see also Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) ("Conclusory

allegations, unsupported by specific facts, will not suffice.")

Second, FS misreads the holding of the Seventh Circuit in *Sokol Crystal* to say

that a statute of limitations period for a trade secret misappropriation claim begins

when a plaintiff is "certain" of the misappropriation. The *Sokol Crystal* decision is

largely a product of the facts presented to that court. In that case, the court had to

---

[49] Perhaps the closest that FS gets to providing evidence that it was merely speculating about AOS's "use" of FS's trade secrets is the deposition testimony of Mr. Schlanger where he testified: "We didn't know for certain in [July 2004] because we didn't have a prototype in our hands." (Schlanger Dep. 298). However, not knowing "for certain" is not the equivalent to "speculation." As the court will discuss later in this order, the standard for when a misappropriation of trade secret claim arises is not and cannot be based on the plaintiff's "certainty" of the misappropriation. Moreover, even if Mr. Schlanger's passing comment in his deposition testimony is meant to indicate that FS's was actively speculating about whether AOS was using the plaintiff's trade secrets, such a "scintilla" of evidence is insufficient to defeat summary judgment on this question, given the rest of the record. *Anderson*, 477 U.S. 251-52. FS also cites to pages 190 through 191 of Mr. Cohen's deposition testimony in PPFF ¶ 214 as evidence that FS was merely speculating regarding whether AOS was using FS's trade secrets. However, FS failed to provide those pages of deposition testimony to the court (the transcript, as provided, omits testimony from pages 184 to 213). It is FS's burden to provide evidence demonstrating that it can survive summary judgment, and it is FS's responsibility to provide the court with the appropriate transcript pages.

determine when the plaintiff *knew* that the defendant was *misusing* the plaintiff's trade secret. 15 F.3d at 1430. The plaintiff in *Sokol Crystal* did not "discover" the defendant's misappropriation upon receiving a device created by the defendant that was "similar to" the plaintiff's device, as the plaintiff "did not yet know the use to which [the similar device was] going to be put." *Id.* Instead, the plaintiff in that case "discovered" the misappropriation when the defendant sold the device to a third party. *Id.* For the court, the mere creation of a device by the defendant that was similar to the plaintiff's product, which was very much allowed under the parties' confidential information agreement, merely provided a "suspicion" of misuse, which was insufficient to "start the clock of the statute of limitations." *Id.* Rather, it was only when the plaintiff discovered that the defendant was going to violate their information sharing agreement by *selling* the product in question that the statute of limitations period began. *Id.* Here, unlike in *Sokol Crystal,* there was no agreement between the parties allowing for AOS to employ FS's alleged trade secrets in manufacturing AOS's products or for AOS to use FS's alleged trade secret to assist AOS's research and development of the eMod. *Id.* at 1429 ("The agreement, in substance, prohibited Granger from using Sokol's confidential information for any purpose other than that for which it was received.") In fact, this case stands in contrast with *Sokol Crystal* because, in this case, the actual commercialization of the

eMod was not the defendant's *initial* misuse of the plaintiff's proprietary information.[50]

The evidence, as discussed above, clearly indicates that FS knew AOS was "using" plaintiff's proprietary information before November 28, 2004.

More broadly, the argument that *Sokol Crystal* stands for the proposition that the "statute of limitations on trade secret misappropriation claims begins to run . . . when a plaintiff can positively and directly prove misappropriation," such as through physically inspecting the product, is deeply flawed. *Chasteen*, 216 F.3d at 1218; *see also Intermedics, Inc. v. Ventritex, Inc.*, 822 F. Supp. 634, 641 (N.D. Cal. 1993) (holding that the premise that a "'cause of action' cannot 'accrue' for statute of limitations purposes unless and until it is clear that a plaintiff has, as a matter of historical fact, a winning claim, i.e., until a plaintiff is in a position to present evidence which will (regardless of what evidence the defense musters) establish facts which make liability a legal certainty" is fundamentally wrong).  Such a proposition would obliterate the purposes of the statute of limitations, providing a perverse incentive to plaintiffs with potential trade secret misappropriation claims to be less than diligent in exploring their claims.  Moreover, as the court in *Intermedics* concluded, requiring that the statute of limitations period begins only when the plaintiff "can unassailably establish a legal claim for trade secret misappropriation" would eviscerate the statute

---

[50] The court notes that the comments the court made during the July 9, 2010 hearing regarding the commercialization of the eMod product, (Tr. 22-24), have nothing to do with when the statute of limitations period begins for a misappropriation of trade secret claim, as commercialization of a product is not the standard for adjudging when the statute of limitations period begins.  Rather, the standard is based off of when the *"initial* misappropriation" is discovered. *Amalgamated Indus.,* 69 Fed. Appx. at 261.

of limitations, as only claims that "ultimately proved to have merit," as opposed to those with specious or unsupportable claims, would have a clear limitations period. *Id.* In fact, taking FS's argument to its logical extreme, as no jury has yet found that AOS actually misappropriated FS's trade secrets, it is still *not absolutely* certain that AOS misused FS's information, and, as such, under FS's logic, the limitations period has not yet begun to run. Setting a standard of near certain knowledge of misappropriation as the measure by which the limitations period's clock starts would be absurd and, as such, this court is persuaded that a claim for trade secret misappropriation accrues when the plaintiff merely has sufficient information to make a "meaningfully colorable" claim, *Porex Corp.,* 284 Ga. App. at 515, – that is, sufficient information to state a claim that could survive a motion to dismiss.[51] *In re Cygnus Telecomms. Tech., LLC*, 536 F.3d at 1357. Moreover, as discussed above, the record indicates that as of the summer of 2004, if not the fall of 2003, FS had "discovered" AOS's use of FS's proprietary information, starting the statute of limitations period.[52]

---

[51] To survive a 12(b)(6) motion to dismiss, the plaintiff's complaint must only "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-57, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)) (emphasis added). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S. Ct. at 1949.

[52] The court is confident that, given what FS knew in 2003 and 2004, the plaintiff could have filed a complaint at that time that would have contained "sufficient factual matter . . .stat[ing] a claim to relief that [was] plausible on its face." *Iqbal,* 129 S. Ct. at 1949.

Finally, the court notes that the plaintiff has failed to present any information or any evidence relevant to the court's inquiry that FS discovered upon its examination of the eMod device in 2006. FS's April 11, 2008 complaint did not allege that the examination of the eMod device provided any sort of insight as to how AOS had misused the information FS provided; in fact, FS fails to mention anything in its complaint regarding its 2006 examination of the eMod, the event that supposedly confirmed that AOS had misappropriated the information FS provided to AOS. In short, the trade secret misappropriation claim that FS alleged in the April 11, 2008 complaint could have easily been made years earlier based on what FS knew in 2004. The undisputed evidence indicates that FS knew that AOS was allegedly misappropriating AOS's trade secrets well before November 28, 2004.[53] Accordingly, the court is obliged to dismiss FS's misappropriation of trade secrets claim, as the claim is barred by the statute of limitations.[54]

---

[53] FS, in discussing *Sokol Crystal,* makes a passing reference to the argument that basing the start of limitations period of less than certain knowledge by the plaintiff of the misappropriation would "offend" Fed. R. Civ. P. 11. Fed. R. Civ. P. 11 requires that the representations to the court in a pleading "will likely have evidentiary support after a reasonable opportunity for further investigation." Nothing in Fed. R. Civ. P. 11 requires that a plaintiff be certain of the claim before filing a complaint; rather, the standard is a belief of a likelihood of support for the claim after appropriate investigation. The evidence in this case indicates that the plaintiff had that belief by the summer of 2004 at the latest. Moreover, the fact that Wisconsin law allows the court to grant an injunction against a person who misuses a claimant's trade secret, provides persuasive evidence to this court that it would not have been an abuse of process for FS to file a complaint prior to the actual commercialization of AOS's product. Wis. Stat. § 134.90(3)(a)(1).

[54] The court's conclusion that "the undisputed evidence indicates that FS knew that AOS was allegedly misappropriating AOS's trade secrets well before November 28, 2004" is not a conclusion that AOS *believed* or *knew* that it could have been sued at that time and has no relevance with respect to FS's spoilation motion. (Docket #176).

### 2. Measures Taken By FS to Guard the Secrecy of its Proprietary Information

In the alternative, even if the court found that there was a triable issue of fact regarding the statute of limitations issue, the court would still grant summary judgment in favor of the defendant on the trade secret claim because FS did not take reasonable steps to maintain the confidentiality of its alleged trade secrets. In order to qualify as a "trade secret," the UTSA requires that the information in question be the "subject of efforts to maintain its secrecy that are reasonable under the circumstance." Wis. Stat. § 134.90. "[F]ailure to take reasonable steps to prevent gratuitous disclosure" of alleged trade secrets forfeits any protection for that information. *Bondpro Corp. v. Siemens Power Generation, Inc.*, 463 F.3d 702, 708 (7th Cir. 2006) (interpreting Wisconsin law). Absolute secrecy is not required to maintain a trade secret, and the "mere fact that [a trade secret owner] disclosed its trade secrets to a 'limited number of outsiders for a particular purpose' – [does] not forfeit trade secret protection." *Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*, 925 F.2d 174, 177 (7th Cir. 1991) (interpreting Illinois law). However, "one who claims a trade secret must exercise eternal vigilance in protecting its confidentiality," *RTE Corp. v. Coatings, Inc.*, 84 Wis. 2d 105, 119 (1978), and disclosure of a trade secret outside a confidential relationship "destroys the legal protection." *Flotec, Inc. v. Southern Research*, 16 F. Supp. 2d 992 (S.D. Ind. 1998) (Hamilton, J.). Moreover, in determining whether a claimant took reasonable steps to protect information as a trade secret, "the presence or absence of confidentiality agreements or other

means to convey confidentiality . . . has a significant and predictable bearing on the outcome of the case." *CMBB LLC v. Lockwood Mfg.*, 628 F. Supp. 2d 881, 885 (N.D. Ill. 2009). Ordinarily, "whether the measures taken by a trade secret owner are sufficient to satisfy the [UTSA's] reasonableness standard . . . is a question of fact for the jury." *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 725-26 (7th Cir. 2003); *see also Rockwell Graphic Sys.,* 925 F.2d at 179 ("Only in an extreme case can what is a 'reasonable' precaution be determined on a motion for summary judgment, because the answer depends on a balancing of costs and benefits that will vary from case to case.") However, in "some circumstances . . . it may be readily apparent that reasonable measures [to maintain the confidentiality of a trade secret] simply were not taken." *Tax Track Sys. Corp.,* 478 F.3d at 787.

Here, the undisputed facts indicate that this case is the "extreme case" – no reasonable jury could find that FS took reasonable efforts to keep its proprietary information confidential so as to warrant protection under the UTSA. In fact, FS failed to take even the most elementary steps to protect its alleged trade secrets. None of the letters or data that FS sent to AOS beared any symbol denoting that the information contained therein was confidential. Moreover, there is no evidence that FS even told AOS that the Colorado company considered the information in question confidential. FS never obtained a confidentiality agreement from AOS protecting any information FS conveyed to AOS. The latter fact is truly remarkable, given that: (1) FS was a sophisticated business operative that had entered into confidentiality

agreements with companies who were doing business with the plaintiff in the past;[55] and (2) AOS and FS entered into an agreement ensuring the confidentiality of *AOS's* proprietary information. Additionally, there is no evidence in the record that AOS ever gave FS the impression that it believed the information in question was confidential or was going to keep the information confidential. Finally, even after the relationship between the two companies soured, FS did not ask for its data map or Loadtec motor back, strongly indicating that it did not consider the information in question confidential. The undisputed facts of this case, which manifest the utter failure of FS to take precautions to ensure that its information was protected,[56] stand in stark contrast to cases where courts have denied summary judgment with respect to the issue of whether a claimant took reasonable precautions to protect its trade secrets. *Cf. Rockwell*, 925 F.2d at 176-77 (holding that it was a jury question where plaintiff stamped drawings confidential, required employees and vendors to sign confidentiality agreements, kept documents in a vault guarded by a security officer, and retained original drawings).

---

[55] FS implies in its brief to the court that this fact cuts in favor of denying the summary judgment motion on the trade secret claim. (Pl.'s Resp. Br. 24 n.20). However, whether FS adequately protected its trade secrets in previous instances is only relevant with respect to showing that FS knew how to protect its information if it truly wanted to do so. In this case, the undisputed facts indicates that FS did nothing to maintain the confidentiality of its proprietary information. "Where the owner of [a trade] secret disregards caution and fails to take steps to safeguard against disclosure, the courts will . . . deny him any relief whatever, principally on the theory that he courts his own disaster." *RTE Corp.,* 84 Wis. at 119 (quoting Callmann, *Unfair Competition Trademarks and Monopolies* (3d ed. 1968), sec. 55.1, pp. 451-53).

[56] FS asserts that it "maintains its trade secrets under lock with access limited to [FS's] two principals." (Pl.'s Resp. Br. 25). However, FS does state a single measure it took to protect the information that it disclosed in this case.

FS's central argument with respect to the "efforts" it employed "to maintain [the] secrecy" of the information it imparted to AOS is that the nature of the relationship between the parties made FS's "disclosure reasonable."[57] (Pl.'s Resp. Br. 24). It is "well established" that the "formation of a confidential relationship imposes upon the disclosee the duty to maintain the information received in the utmost secrecy," and the formation of such a confidential relationship, including an oral confidentiality agreement, can, depending on the circumstances, constitute a "reasonable" effort to maintain the secrecy of a claimant's information. *Learning Curve Toys, Inc.,* 342 F.3d at 725-26. The court notes, however, that even if some sort of confidential relationship existed between the parties, the evidence, when viewed in a light most favorably to the plaintiff, must still indicate that it was "reasonable" for FS to disclose its trade secrets to AOS without taking any other precautions. *Id.; see also* Wis. Stat. § 134.90(1)(c)(2) ("The information is the subject of efforts to maintain its secrecy that are reasonable under the circumstances."). Here, the court concludes that, even assuming that the parties had a relationship with implications that the information shared between the parties

---

[57] FS makes a slight variation on this argument, stating that the disclosure of trade secrets "itself imposes a duty of confidentiality on the part of the person to whom disclosure is made." (Pl.'s Resp. Br. 24) (citing to *Rockwell Graphic*, 925 F.2d at 177). The rule espoused by FS from *Rockwell Graphic* is not, however, that *every* disclosure of a trade secret imposes a duty of confidentiality. If that were the rule, the statutory requirement that a claimant take reasonable precautions in protecting its trade secrets would be meaningless. Instead, a duty of confidentiality, as *Rockwell Graphic* court explains, is a product of the relationship between the parties and not merely the fact that a trade secret has been divulged. For this reason, the court does not quibble with FS's list of examples on page 25 in its brief to the court of the "reasonableness of allowing certain disclosures of trade secrets for business purposes." (Pl.'s Br. 25).

would be confidential, the undisputed evidence, even when construed most favorably toward the plaintiff, does not indicate that FS took reasonable precautions with respect to its proprietary information. As discussed above, FS did not take any affirmative steps to protect the information it was providing to AOS, such as even mentioning to the defendant the information FS disclosed to AOS was expected to be kept confidential. Moreover, unlike in *Learning Curve Toys,* the only case that FS can cite to where the existence of a confidential relationship was evidence that a party took reasonable precautions to protect its information, in this case the undisputed facts show: (1) the plaintiff did not have any explicit discussions with the defendant regarding keeping confidential the plaintiff's trade secrets; and (2) the parties involved in this case are not "small," "unsophisticated" parties.[58]  342 F.3d at 725-26.   The evidence of an oral confidentiality agreement and the lack of sophistication of the parties was at the heart of the court's holding in *Learning Curve Toys*. *Id.*

---

[58] FS argues that "the jury may also consider the sophistication of [FS]" as a factor for finding that FS took reasonable precautions, noting as evidence of the plaintiff's lack of sophistication FS's lack of a legal department and the fact that Mr. Cohen thought the confidentiality agreement he signed applied to all technology between the parties.  (Pl.'s Resp. Br. 26).  While it is true that in determining what is a reasonable precaution, a jury can take into account the "size and sophistication of the parties," *Learning Curve,* 342 F.3d at 726, as discussed above, there is ample evidence that Joe Cohen was a sophisticated party, who had spent over thirty years working in the swimming pool pump industry.  (PPFF ¶ 121).  Moreover, the plaintiff plainly knew how to protect its trade secrets, as FS had entered into confidentiality agreements with several parties in the past.  Also, FS was on notice in this case that a confidentiality agreement was likely needed, as AOS had FS signed an agreement whose clear language only protected AOS's information.   In short, while FS attempts to feign ignorance in its briefs, the undisputed facts indicate that FS was a far more sophisticated party than either of the two parties involved in the *Learning Curve* case.

However, even if the court accepted FS's argument that the existence of a confidential relationship in and of itself is enough of an "effort" protecting a trade secret to avoid summary judgment,[59] FS has not presented enough evidence that a confidential relationship existed between the parties. The *Restatement* provides the relevant framework for determining when a recipient of a trade secret disclosure is bound by a duty of confidence. *Restatement* at § 41. A person "to whom a trade secret has been disclosed owes a duty of confidence to the owner of the trade secret . . . if:

> (a)    the person made an express promise of confidentiality prior to the disclosure of the trade secret; or
> (b)    the trade secret was disclosed to the person under circumstances in which the relationship between the parties to the disclosure or the other facts surrounding the disclosure justify the conclusions that, at the time of the disclosure,
>> (1)    the person knew or had reason to know that the disclosure was intended to be in confidence, and
>> (2)    the other party to the disclosure was reasonable in inferring that the person consented to an obligation of confidentiality."

*Id.*; *see also RTE Corp.,* 84 Wis. 2d at 117-118 ("Where what is thought to be a trade secret is disclosed, the question posed is whether under the circumstances, the recipient of the information knew or should have known that the information is a trade secret and that the disclosure was made in confidence.")

Applying these principles to the case at hand, the court first can easily conclude that here is no evidence that AOS made any sort of *express* promise of

---

[59] The court notes that FS failed to cite a single case supporting such an extreme premise.

confidentiality prior to the disclosure of any of FS's trade secrets.[60]  The only issue is whether there are any facts from which a reasonable jury could conclude that an *implied* duty of confidence existed between the parties.  However, the court is loathe to create out of wholecloth an implied confidentiality agreement where there the parties already signed an express confidentiality agreement that had clear provisions that were "one-way" in nature and did not require AOS to keep FS's information confidential.  "It is well established that courts will not recognize implied obligations that are contrary to terms of a party's written confidentiality agreement."[61]  *BDT Prods. v. Lexmark Int'l, Inc.*, 124 Fed. Appx. 329, 332 (6th Cir. 2005) (refusing to recognize an implied duty of confidentiality agreement when an express confidentiality agreement existed that did not protect the claimant's information) (citing to *Ferroline Corp. v. Gen. Aniline & Film Corp.*, 207 F.2d 912, 922 (7th Cir.

---

[60] In this respect, this case is again far removed from the case of *Learning Curve Toys*.  342 F.3d at 714.  In that case, there was testimony from the claimant that, before sharing information, he told the defendant that "I have some things, some ideas . . . and I think they're confidential as well . . . so if we're both okay with that, we should continue."  *Id.* at 725.  Moreover, the plaintiff testified that:  (1) he did disclose information to the defendant, from which the jury could have inferred that the plaintiff would not have done so "in the absence of a confidentiality agreement"; and (2) the defendant expressly and orally agreed to keep the information confidential.  *Id.*  Here, the plaintiff readily concedes that it never told the defendant that any of the information FS was disclosing was confidential.  Hence, unlike in *Learning Curve Toys*, there is no evidence in this case that a "confidential relationship" was formed that would have "imposed upon the disclosee a duty to maintain the information received in the utmost secrecy."  *Id.* at 726.

[61] With respect to the framework provided by the *Restatement*, to the extent that *Restatement* indicates that an implied duty of confidentiality can be judicially created in the face of an express agreement to the contrary, this court disagrees with the *Restatement* and finds the Sixth Circuit's well-reasoned opinion in *BDT Prods,* 124 Fed Appx. at 332, far more on point.  However, the *Restatement*, while providing the general framework for determining whether a duty of confidentiality exists, does not comment with respect to the specific issue in *BDT Prods.* or this case.

1953)); *see also* 1 Roger Milgrim, *Milgrim on Trade Secrets* § 3.03 (2010) ("It should be kept in mind that where parties have expressly contracted . . . and have not provided for confidential disclosure or restrictions based on any confidential duty, the courts are not apt to imply the existence of such restrictions.")

However, even if this court were willing to accept that the law allows it to craft an implied duty of confidentiality despite the existence of a contemporaneous written confidentiality agreement where that duty was wholly absent, the undisputed facts in this case, when viewed in a light most favorably to FS, simply do not support an implied duty of confidentiality. Returning to the framework from the *Restatement* § 41(b)(1), there is no evidence that AOS *actually* knew that FS considered any information provided to it to be a trade secret. The question, therefore, is whether AOS *should have known* that FS considered the information to be a trade secret, which can only be answered by considering "all of the circumstances as they *appeared to [the defendant]* when the information was disclosed." *Flotec, Inc.,* 16 Supp 2d. at 1006 (citing to *Rockwell Graphic Systems,* 925 F.2d at 179-80) (emphasis added). As discussed above, FS provided no indication to AOS that the information FS was providing was intended to be kept in confidence. In fact, Mr. Cohen disclosed trade secrets without any prompting by AOS as early as January 6, 2003, in a letter that provided the initial *offer* to AOS regarding FS's interest in doing business with the defendant, indicating to AOS that FS was willing to disclose its proprietary information even before any business relationship was even close to

being formalized.[62]  (Docket #122, Ex. 18).  Moreover, the fact that FS willingly agreed to a confidentiality agreement that clearly protected AOS's proprietary information, but did nothing to protect FS's information provided an obvious signal to AOS that FS "knew how to ask that information be considered confidential if it really thought the company's crown jewels were at risk." *Flotec*, *Inc.*, 16 F. Supp. 2d at 1007.  Furthermore, FS's September 22, 2003 letter informed AOS that the plaintiff had "not granted any rights" to AOS for the use of FS's proprietary information and that FS believed there was "no formal agreement" in place.  (Docket #122, Ex. 21).  The September 22, 2003 letter is incredibly strong evidence that FS was willing to disclose its trade secrets outside the context of an actual agreement providing rights to AOS to use FS's information.

The closest that FS comes to persuading the court that AOS "should have known" that FS considered the information in question to be confidential is the argument that the parties had a joint-venture, which by its very nature implies that disclosures made in the context of such an arrangement were confidential.  (Pl.'s Resp. Br. 24-25) (citing to *Jolin v. Oster,* 44 Wis. 2d, 623, 629 (1969) for the duties that exist when parties are joint adventurers).  No party details to the court in its briefs what a "joint-venture" entails under Wisconsin law, which is surprising given the centrality of that legal issue to FS's argument.  Nonetheless, under Wisconsin

---

[62] In that letter, Cohen provided AOS with a list of the features of the Loadtec motor, some of which FS now "claims" as a trade secret.  (Pl.'s Resp. Br. 17) ("[FS] claims the following categories of information as trade secrets . . . the features of startup logic delay.")

law, a joint-venture can only be established by: (1) contribution of money or services by each of the parties; (2) joint proprietorship and mutual control over the subject matter of the venture; (3) an agreement to share profits; and (4) an express or implied contract establishing the relationship. *Ruppa v. American States Ins. Co.*, 91 Wis. 2d 628, 645, 284 N.W. 2d 318, 325 (1979). The parties' agreement must also establish a relationship whereby each co-venturer is both a principal and an agent of the others. *Edlebeck v. Hooten*, 20 Wis. 2d 83, 88 (1963) ("Each must agree expressly or impliedly to a community of interest as to the purpose of the undertaking and to stand in the relation of agent as well as principal to the other coadventurers with equal right of control of the means employed to carry out the common purpose.") The burden of proving such a relationship existed is upon the party asserting the joint venture. *Troy Co. v. Perry,* 68 Wis. 2d 170, 177 (1975).

Here, there is no evidence that a joint venture relationship existed between the parties. Instead, the record indicates that, at best, AOS was employed by FS as a successor to Franklin in producing a load-sensing pool pump motor. The plaintiff asserts that the relationship was not established until after "ten to fifteen conversations" regarding a "suction entrapment preventative motor" and "numerous letters" were exchanged between FS and AOS.[63] (PPFF ¶ 196). However, the evidence that FS cites to support its finding of fact does not indicate that the parties

_____

[63] The plaintiff's assertion, of course, is completely contradicted by Mr. Schlanger's February 24, 2004 letter, which stated that the parties had not yet entered "into an agreement . . . which honor[ed the plaintiff's] intellectual property rights." (Docket #157, Ex. UU).

actually had reached an agreement to jointly-develop a pool pump where the two parties would be sharing the profits of such a venture or exercising joint control over each other in the project; rather, the evidence shows the parties were merely bantering back and forth about a potential project where AOS was to produce a device for FS. (Cohen Dep. 10/21/09 213-14) ("I verified that they, [AOS], had the *interest* in developing a load sensor pool pump motor") (emphasis added); *id.* at 220 ("We were excitedly talking about the features that *could* be designed into the motor, and I believed he *requested* that I put together the feature outline") (emphasis added); (Metzler Dep. 85) ("Yeah, I definitely had talked to Joe by the 6th of January, but it was strictly developing a motor *for* him") (emphasis added).[64]

FS's evidence that there was a joint-venture in place between the companies apparently stemmed from Mr. Cohen's reading of a January 16, 2003 letter sent from AOS to FS.[65] (Cohen 10/21/09 221) ("He sent a letter that said we were co-developing, the way I read it.") Mr. Cohen's interpretation of what AOS's letter to FS meant or what a "joint-venture" entails is completely irrelevant to the issue at hand, however; the main question is whether there is any evidence, including the January 16, 2003 letter, that a joint-venture actually existed between FS and AOS,

---

[64] The court notes that the citation to Mr. Metzler's deposition does not even come close to supporting PPFF ¶ 96, as Mr. Metzler's testimony is with regard to conversations he had prior to January 6, 2003, which was well before FS and AOS allegedly entered into any sort of business arrangement together and before FS had ended its relationship with Franklin.

[65] Mr. Cohen did not specify what letter he was referencing in his deposition, but the only letter that comes close to the assertion Cohen makes in his testimony is the January 16, 2003 letter.

given Wisconsin law on the matter.[66]  The letter Cohen references in his deposition

testimony, even when viewed in a light most charitable to FS, does not even begin

to rise to the level of placing AOS on notice that the parties were in some sort of joint

venture relationship.  While AOS's January 16, 2003 letter proposes that AOS would

like to "work and develop concepts for suction entrapment" with FS, the letter does

not solidify any sort of relationship between the parties.  The January 16, 2003 letter,

at best, indicates a general and non-specified interest on the part of AOS to work

with FS with regard to developing SVRS technology.  (Docket #122, Ex. 19).

Moreover, the fact that FS cannot cite to a single conversation or any other

evidence that the parties actually agreed to engage in mutual control over a venture,

share profits or proceeds of a project, or be principals and agents for each other,

solidifies the court's conclusion that there was no joint-venture relationship between

the parties.  FS does indeed have evidence where AOS admits that it was "working

with" FS in developing a pool pump motor, such as Mr. Mehlhorn's deposition

testimony (Mehlhorn Dep. 158), AOS's internal documents referring to a "working

agreement" with FS (Docket #157, Ex. ZZ), or Mr. Schlanger's deposition stating that

AOS considered its work on the motor a "project."  (Schlanger Dep. 275-76).  All of

that evidence merely indicates that, at best, AOS and FS had some sort of business

arrangement, but it begs the question of whether that arrangement was a joint-

venture.  Here, the evidence is quite one-sided that the parties did not have "mutual

---

[66] The court notes, despite FS's best efforts, the choice of law in this case is Wisconsin law, not Mr. Cohen's unique take on the law.

control" over the subject matter of the arrangement. Mr. Mehlhorn's deposition testimony indicates that the business arrangement was one where FS provided the general requirements or features for the motor that it wanted, but that AOS had complete autonomy in developing a motor according to its own specifications. (Mehlhorn Dep. 202). In fact, FS and AOS did not "work together on any specifications" of the circuitry of the load sensing pool pump motor, and FS did not provide any "input into the development" of the device. *Id.* While Mr. Mehlhorn chatted with Mr. Cohen during the summer of 2003 regarding the motor, there is absolutely no evidence that FS or AOS had the ability to exercise control over the other party with respect to their business arrangement. *See Trustmark Ins. Co. v. General & Cologne Life Re of Am.*, 424 F.3d 542, 548 (7th Cir. 2005) ("These parties could not exercise any control over each other's operations or policies whatsoever, and therefore we affirm the district court's grant of partial summary judgment on the joint-venture claims for lack of mutual control") (interpreting synonymous Illinois law). Moreover, the plaintiff has provided simply no evidence that the parties shared profits or proceeds of a project or acted as principals and agents for each other, necessary elements of a joint-venture. *Ruppa,* 91 Wis. 2d at 645.

Perhaps most importantly, there is little to no evidence of an *agreement* in place between the parties to engage in a *joint-venture*; in fact, the best[67] evidence

---

[67] The court would say the "only" evidence, but Mr. Schlanger's February 24, 2004 letter also indicates that the parties had not yet entered "into an agreement . . . which honor[ed the plaintiff's] intellectual property rights." (Docket #157, Ex. UU).

in the record with regard to whether there was ever *any sort* of agreement, whether

express or implied, between the parties is FS's September 22, 2003 letter, which

informed AOS that the plaintiff had "not granted any rights" to AOS for the use of

FS's proprietary information and that FS believed there was "no formal agreement"

in place. (Docket #122, Ex. 21). More broadly, the court finds that no reasonable

jury could conclude that two sophisticated business entities, like FS and AOS, would

formalize a joint-venture project without putting it into writing. This is particularly true

in the context of this case, given that the only other alleged "joint-venture" the plaintiff

participated in – FS's business arrangement with Franklin – FS actually had a *written*

agreement with the other party.[68] (DPFF ¶ 27).

The court concludes its discussion of the possibility that the parties engaged

in a joint venture by citing the well-reasoned comments of Judge William Griesbach,

included in a 2008 decision, which this court finds equally appropriate for this case:

> Yet there seems to be none of the indicia one would expect to find in a
> joint venture – mutual contribution of services or other value,
> agreement to share profits, common control, or even any evidence that

---

[68] The plaintiff cites to the pre-UTSA cases of *Crocan Corp. v. Sheller-Globe Corp.,* 385 F.Supp. 251, 253 (N.D. Ill. 1974) and *Franke v. Wiltschek,* 209 F.2d 493 (2nd Cir. 1954) for the proposition that disclosures of trade secrets for business purposes can be reasonable. (Pl.'s Br. 25). However, those cases are easily distinguishable on its facts. In *Crocan Corp.,* the plaintiff "failed to disclose to [the plaintiff] its preconceived intention to manufacture [the product in question] in competition with [the plaintiff] and by falsely representing to [the plaintiff] that [the defendant] would manufacture [the product] only for [the plaintiff] and would not market its own product." 385 F. Supp at 252. There is no evidence of similar representations by AOS in this case. Similarly, in *Franke*, the defendants "hornswoggled the plaintiffs into hiring them as salespersons, acting not with the intent to sell the product but with the 'resolve to copy the product and market it for their own profit.'" *Inflight Newspapers v. Magazines In-Flight, L.L.C.*, 990 F. Supp. 119, 129 (E.D.N.Y. 1997) (explaining *Franke*). "The dissimilarities with the instant action are readily apparent," *id,* as there is no evidence in the record that AOS lured FS into giving up its trade secrets or that AOS actually agreed to any business arrangement with FS.

the parties agreed to become joint venturers. *Spearing v. County of Bayfield*, 133 Wis.2d 165, 173, 394 N.W.2d 761 (Wis. Ct. App. 1986). The evidence [the plaintiff] offers merely suggests that the parties had a run-of-the-mill on-again, off-again business relationship comprised of a few meetings and letters. To the extent there was joint effort on the project, there is no evidence of any agreement governing that relationship. All sorts of design collaborations occur in the commercial world, but collaboration on its own does not mean the parties have entered into a joint venture. One can contribute ideas to another with the expectation that the two are simply engaged in a buyer-seller relationship, not a joint venture. For example, suppose an auto manufacturer hires a design firm to design a new car model. The manufacturer, of course, is also in the design business itself. No doubt the manufacturer and design firm will work very closely together, both contributing ideas to the project. Yet without an agreement to share profits or to create an independent "venture," the manufacturer is merely a customer who happens to be involved in the design of the product it wishes to purchase. The two entities are not going to market the car together and split up the profits, and no one would consider the new car model to be a "joint venture." The same appears to be true here: [the plaintiff] has argued simply that the parties worked together on the design for a time, but it has not provided any evidence of the key agreements necessary to conclude that a "venture" existed: how would the project be sold? How would the profits be shared? Who exercised control over the venture? What happens if the parties decide to cease doing business?

*Studio & Partners, s.r.l. v. KI*, No. 06-CV-0628, 2008 U.S. Dist. LEXIS 11321, at* 43-35 (E.D. Wis. Feb. 14, 2008).

Given that there was no agreement in place between the parties to engage in a joint-venture, the court can easily conclude that the defendant did not have "reason to know that [FS's] disclosure [of information to AOS] was intended to be in confidence." *Restatement* § 41(b)(1). Moreover, the court also concludes that there is no evidence that FS "reasonably inferred" that AOS had consented to an

obligation of confidentiality.[69]  *Id.* at § 41(b)(2).  FS does not discuss in its brief to the

court or its many findings of fact that AOS even provided the slightest indication to

FS that the defendant agreed to keep FS's information confidential.   As such, the

court does not hesitate in finding that there is a lack of evidence establishing that a

confidential relationship between the two parties existed and, with that, a lack of any

evidence from which a reasonable jury could find for FS on its trade secret claim,

even if it was not time barred.[70]  FS simply "did not take reasonable precautions

which would prevent [the defendant] from becoming a competitor if a satisfactory

arrangement could not be worked out with" AOS.  *Besly-Welles Corp. v. Balax, Inc.,*

---

[69] Hence, even if the court thought that AOS had reason to know that FS's disclosure of information to AOS was intended to be in confidence, the court would still find that no confidential relationship existed between the parties.

[70] FS argues in passing that the "jury may be persuaded by Franklin Engineer Mr. McAfee's opinion that any engineer would know this information was secret and that it would be 'wrong' to use it without permission from [FS]."  (Pl.'s Resp. Br. 26).  This argument fails to persuade the court.  First, McAfee's testimony was exclusive to discussing how Franklin treated the information that was given to them by a business with whom Franklin was in a joint-venture.  As discussed below, the evidence here does not show that FS and AOS were in a joint-venture.   More importantly, Mr. McAfee's discussion about the customs by Franklin with regard to its customers' information is not evidence of a custom within the industry, such that "any engineer" would know such information to be secret.  Finally, the court must examine the circumstances as they appeared *to the defendant* when the information was disclosed.    *Flotec, Inc.,* 16 Supp 2d. at 1006 (emphasis added).  There is no evidence that AOS knew of this custom.

291 F. Supp. 328, 346 (E.D. Wis. 1968).[71]  FS "should have taken steps to insure the confidentiality of the information" it gave to AOS but did not, warranting judgment for AOS on the trade secret claim.[72]  *Id.*

The court could continue to analyze AOS's other arguments for granting summary judgment in the defendant's favor on the trade secret misappropriation claim, such as the contention that FS's information does not qualify as a trade secret because it is contains information that was "generally known or readily ascertainable by proper means." (Def.'s Br. 22).  However, the court feels the proverbial "horse" is "dead" and is more than satisfied that FS will not be able to survive summary

---

[71] The court notes that the opinion in *Besly-Welles Corp.* cited above was affirmed in part and reversed in part by the Seventh Circuit in *Bendix Corp. v. Balax, Inc.*, 421 F.2d 809 (7th Cir. 1970).  The Seventh Circuit specifically affirmed the district court's handling of the trade secret issue.  *Id.* at 821 ("The court specifically found there was not sufficient testimony to establish the existence of a joint venture which plaintiff now urges as the basis for the required confidential relationship. We agree and hold defendants are not liable for appropriation of plaintiff's trade secrets.") The decision, which pre-dates Wisconsin adoption of the UTSA, is persuasive authority on the issue of how much evidence is needed at summary judgment to prove that a joint-venture existed between two parties, such that a duty of confidentiality existed with respect to alleged trade secrets.

[72] Hence, this case is plainly distinguishable from *Bondpro Corp.,* 463 F.3d at 708, where the Seventh Circuit held that disclosures of a trade secret in the context of licensing negotiations did not forfeit the plaintiff's trade secret claim.  In that case, BondPro "did take measures to conceal its process," such as "negotiating confidentiality agreements with employees customers, and suppliers (including [the defendant]) and assuring that the process itself and documents describing it were kept under lock and key."  *Id.*  Here, FS failed to take any efforts to protect its information.

judgment on the trade secret misappropriation claim[73] and will not delve into the remaining morass of the trade secret claim.[74]

## B.    Unjust Enrichment Claim

The remaining claim of relief that the plaintiff alleges in its complaint is an "unjust enrichment/misappropriation of business value" claim.  (Compl. ¶¶ 30-34). Specifically, FS asserts that, after the plaintiff had "expended" considerable efforts "compiling" testing" data and "operational protocols" for a "load-sensing, suction entrapment-preventative motor," the plaintiff "conferred a benefit upon [AOS] by" sharing the relevant information with the defendant, who, in turn, "realized a benefit" from the information provided by FS under circumstances that would be "inequitable for the defendant to retain the benefit without payment of its value."  *Id.*  On summary judgment, with respect to the unjust enrichment claim, the defendant argues that "FS has no evidence that AOS used any FS information . . . after December 2004," and,

---

[73] The court notes that even if the court resolved FS's motions for *in camera* review (Docket #90) in favor of FS, the court would still grant summary judgment in favor of AOS on the trade secret claim, as none of the evidence at issue in that motion casts doubt as to whether:  (1) FS timely filed its trade secret claim; and (2) FS adequately protected its alleged trade secrets.  With respect to the latter point, the court notes broadly that none of the evidence at issue with respect to FS motion for *in camera* review would have placed AOS on notice that information conveyed to it by FS was meant to be confidential or that AOS and FS had some sort of agreement as joint-venturers.  Moreover, the court also notes that if the court resolved FS's motion for spoilation sanctions, (Docket #176), in favor of FS, FS still did not file its complaint in time and FS has already admitted that it did not place AOS on notice that FS's information was meant to be confidential, which independently defeats FS's trade secret claim.

[74] The plaintiff's argument that AOS is estopped from arguing that FS's trade secrets are not protectable (Pl.'s Resp. Br. 14), is only an argument against AOS's assertion that the information in question is "publically known" and has no bearing on the two issues discussed in detail by the court.

accordingly, asks that the court enter judgment that AOS did not use FS's information after December of 2004. (Def.'s Br. 27).

The defendant's argument appears perplexing, as its not entirely clear why AOS's alleged "non-use" of FS's information after 2004 is even relevant to the unjust enrichment claim. While the issue of "non-use" of FS's information after December of 2004 is obviously relevant in the context of FS's trade secret misappropriation claim, where a plaintiff can prove such a claim by showing that the defendant "misused" a trade secret, Wis. Stat. § 134.90(2)(b), neither of the parties' briefs addresses why the issue of *when* AOS "used" FS's information is relevant to the unjust enrichment claim where the issue is whether FS "conferred a benefit on" AOS, AOS "knew of the benefit," and it would be inequitable to allow" AOS to "retain the benefit." *Bilharz v. First Interstate Bank*, 98 F.3d 985, 988 (7th Cir. 1996) (citing *Watts v. Watts*, 137 Wis. 2d 506, 531, 405 N.W.2d 303, 313 (1987)). In fact, AOS did not cite a single unjust enrichment case to support its contention that the lack of direct evidence that the defendant utilized FS's proprietary information after December of 2004 warrants a judgment of "no use of FS's information after December 2004" with respect to the unjust enrichment claim. (Def.'s Br. 28). The plaintiff's brief is equally unhelpful, as FS opted to focus on the issue of "use after December 2004" with respect to how it affected the trade secret claim and wholly ignored the unjust enrichment claim. (Pl.'s Resp. Br. 26-29).

Not withstanding the lack of adequate analysis from the parties' submissions, the unjust enrichment claim is premised on the general theory that AOS owes the plaintiff profits AOS earned through the unjust "use" of the plaintiff's information. *See Gary Friedrich Enters., LLC v. Marvel Enters.*, No. 08 Civ. 01533, 2009 U.S. Dist. LEXIS 127185, at *23 (S.D.N.Y. June 26, 2009) (framing identical New York unjust enrichment law in the context of "use" of intellectual property). AOS asserts that there is no evidence supporting the claim that there was no "use" of FS's information after December 2004. AOS supports its contention by stating that the later versions of its eMod and the Guardian products: (1) do not have the same features[75] as the Loadtec motor; (2) do not use a change in "power factor" as the means of detecting and shutting off the motor in response to an underload condition, as the Loadtec motor did; (3) do not use the exact "trip points" of the Loadtec motor; and (4) did not use the exact test stand "improved by [Mr.] Cohen's recommendations in 2003" in their development. *Id.* at 28-30. However, AOS's argument only raises the question of whether the defendant would have developed the later generations of its pool pump motor if not for the alleged benefit that FS

---

[75] For example, AOS notes that the later version of the eMod and the Guardian do not have a "soft-start" feature, a two minute "logic delay" at startup, or a "notched end belll." (Def.'s Br. 28-30).

provided to AOS in 2003 and 2004.[76] The answer to that question remains in dispute as there is evidence in the record that AOS's SVRS devices were developed on a "continuum" and were continually adjusted and improved, raising the issue of whether the information FS provided to AOS was instrumental in allowing AOS to develop any of its pool pump motors. Moreover, FS has provided expert testimony that FS's information substantially contributed to AOS's anti-entrapment devices. (Neuhalfen Dep. 224). The jury could be persuaded that AOS "used" FS's information after December of 2004, in the sense that the load-sensing motors that AOS developed after that time period were, in part, a product of the information and advice FS initially provided to AOS.[77] While the defendant asserts that it could not have been "enriched" because "AOS was already working on a motor that would

---

[76] Notably, "AOS is not moving for summary judgment of no use in 2003-2004" (Pl. Rep. Br. 15), as FS has provided enough evidence to make a triable issue as to the question of whether FS *ever* conferred a benefit that AOS ought to pay. Specifically, FS has submitted evidence that Mr. Cohen provided AOS with information regarding how to properly create and test a load-sensing pool pump motor. Moreover, FS has presented evidence that the initial version of AOS's motor incorporated many of the features of the Loadtec motor, providing enough circumstantial evidence for a reasonable jury to conclude that AOS used the information provided by FS to AOS's benefit. Additionally, the defendant does not raise an issue as to whether the plaintiff provided sufficient evidence to prove that it would be inequitable for AOS to retain the benefit of the information FS provided to the defendant without compensation.

[77] This statement is premised on the idea that the concept of "use" of FS's information by AOS and when AOS's "use" occurred is even relevant to the unjust enrichment issue. As long as FS can prove that FS ever "conferred a benefit on" AOS, AOS "knew of the benefit," and it would be inequitable to allow" AOS to "retain the benefit," *Bilharz*, 98 F.3d at 988, FS will prevail on its unjust enrichment claim. The question then would becomes the extent of damages FS should be awarded. The measure of the damages under an unjust enrichment claim is limited to the value of the "benefit conferred upon the defendant." *Mgmt. Computer Servs., Inc. v. Hawkins*, 206 Wis. 2d 158, 188, 557 N.W.2d 67 (1996). The value of the benefit conferred by FS to AOS will be a product of how useful the information FS provided to AOS was and how much AOS was able to utilize that information to develop its future products, issues that are in dispute. The court is not, however, in this order, opining on the efficacy of the experts FS has proffered with respect to the damages related to the unjust enrichment claim.

shut down in the same conditions" as the Loadtec motor (Def.'s Br. 30 n.11), the issue of whether AOS would have successfully developed any of its motors without FS's help is very much in dispute.[78]   As such, the court will deny AOS's motion for summary judgment of "no use of FS's information after December 2004 based on FS's lack of evidence." (Def.'s Br. 28).

## C.    Remaining Issues in the Case

With the resolution of AOS's summary judgment motion, the court notes that there are three major[79] motions remaining on the docket for this case.  First, FS filed a motion for "in-camera review" to determine whether certain documents have been improperly shielded from disclosure because of an assertion of the attorney-client privilege.  (Docket #90).  Second, AOS has filed a motion to exclude FS's claim for future damages.  (Docket #111).   Third, on April 20, 2010, FS filed a motion for spoilation sanctions.  (Docket #176).  The court has reviewed each of the remaining motions.  The court largely views those motions as being premature in nature, given that they were filed before the court had an opportunity to review the summary judgment issue.  A significant portion, if not the majority, of these materials are

---

[78] In fact, viewing the evidence in total and making inferences a light most favorable to FS, a reasonable jury could conclude that AOS's efforts to develop an SVRS device were quite minimal before FS provided information to AOS.  The court notes that as of 2001 all AOS had with respect to its SVRS device was "schematics" and the physical "circuit boards" for a "pool pump suction detector."  (DPFF ¶ 11)

[79] There are also several motions to "seal" that the court will resolve in this order.  (Docket ##'s 88, 130, 133, 137, 144, 153, 155, 160, 162, 168, 170, 175, 178, 183).  The court, upon review of the motions to seal and their accompanying declarations, finds that sealing the relevant information provided by the parties is warranted.

related to evidence that would have supported the trade secret claim, which has now been dismissed by the court. In general, the motions were all raised under the assumption that the trade secret claim remained a viable claim. The court also notes that AOS's motion to exclude FS's claim for future damages has been largely stalled by the delay in releasing supplemental expert reports relating to damages. While no new theories can be espoused in those supplemental reports, the court will require those reports to fully analyze the methodologies used by FS's experts, and the court would greatly benefit from the parties' own analysis of those supplemental reports as well. Instead of necessitating that the court delve into the remaining motions and attempt to separate the wheat from the chafe to determine how relevant those motions are in light of today's order, the court finds that the far more prudent course of action is to deny all three of the remaining motions without prejudice, allowing the parties an opportunity to determine whether they would like to continue to pursue the motions given the state of the case. If the parties do wish to resubmit any motions, the court would be greatly aided by the parties' efforts to revise and update their current briefs regarding those motions so that they focus exclusively on the plaintiff's remaining claim. However, given the court's comments in this order and during the July 9, 2010 hearing, it would greatly behoove counsel and their respective clients to candidly discuss with each other the course that lies ahead in this case. Such discussions should focus on whether it is in anyone's best interest to continue to protract this litigation any further.

Accordingly,

**IT IS ORDERED** that the plaintiff's motion for leave to file its motion for *in camera* review and exhibits under seal (Docket #88) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that the plaintiff's motion for *in camera* review (Docket #90) be and the same is hereby **DENIED without prejudice**;

**IT IS FURTHER ORDERED** that the defendant's motion to exclude "Fail-Safe's Claim for Future Damages" (Docket #111) be and the same is hereby **DENIED without prejudice**;

**IT IS FURTHER ORDERED** that the defendant's motion for summary judgment (Docket #121) be and the same is hereby **GRANTED in part** and **DENIED in part**. The court grants summary judgment as to the plaintiff's trade secret misappropriation claim against the defendant and denies summary judgment as to the plaintiff's unjust enrichment claim against the defendant;

**IT IS FURTHER ORDERED** that plaintiff's motion to "seal exhibits accompanying Rule 7.4 expedited non-dispositive motion to preclude introduction of expert testimony and written reports" (Docket #130) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that the defendant's motion to seal "Exhibit E to Reichenberger Declaration in Support of AO Smith's Response to Motion to Allow Supplemental Expert Reports" (Docket #133) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that plaintiff's motion to file "Exhibit Accompanying its Rule 7.4 Expedited Non-Dispositive Unopposed Motion for Extension Of Time to File its Summary Judgment Response and Motion For Extension of Time to File its Response to A.O. Smith's Motion to Exclude" under seal (Docket #137) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that the defendant's motion for leave to file under seal its "memorandum in support of its motion for protective order to preclude Fail-Safe's Use of New Experts or Theories and Exhibits to Supporting Declaration" (Docket #144) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that the defendant's motion to file "Response to A.O. Smith's *Daubert* Motion to Exclude Fail-Safe's Claim for Future Damages, Supporting Declarations, and Exhibits" under seal (Docket #153) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that plaintiff's motion to seal "Response to A.O. Smith Corporation's Motion for Summary Judgment, Supporting Declarations, and Exhibits" (Docket #155) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that plaintiff's motion to seal "Fail-Safe, LLC's Response and Supplement to A.O. Smith Corporation's Proposed Findings of Fact in Support of its Motion for Summary Judgment" (Docket #160) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that plaintiff's motion to seal "Fail-Safe, LLC's Motion to File its Response to A.O. Smith Corporation's Motion for a Protective Order to Preclude Fail-Safe's Use of New Experts or Theories, Supporting Declaration, and Exhibits" (Docket #162) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that defendant's motion for "Leave to File Under Seal its Reply in Support of its Motion for a Protective Order to Preclude Fail-Safe's Use of New Experts or Theories" (Docket #168) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that defendant's motion for "Leave to File Under Seal its Reply Memorandum in Support of its Motion for Summary Judgment, Responses to Fail-Safe's Proposed Findings and Exhibits to Supporting Declaration" (Docket #170) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that plaintiff's motion to seal "Fail-Safe LLC's Motion to File it Motion for Spoilation Sanctions, Supporting Declaration, and Exhibits" (Docket #175) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that plaintiff's motion for sanctions (Docket #176) be and the same is hereby **DENIED without prejudice**;

**IT IS FURTHER ORDERED** that defendant's motion to seal "Memorandum in Opposition to Plaintiff Fail-Safe, LLC's Motion for Spoilation Sanctions and Exhibits to Supporting Declaration" (Docket #178) be and the same is hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that plaintiff's motion to seal its "Reply in Support of its Motion for Spoilation Sanctions, Supporting Declaration, and Exhibits" (Docket #183) be and the same is hereby **GRANTED**.

Dated at Milwaukee, Wisconsin, this 3rd day of September, 2010.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge